[No. S153002. Apr. 6, 2009.]

EVELYN CONROY, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

1246

COUNSEL

Mahoney & Soll, Paul M. Mahoney and Richard A. Soll for Plaintiff and
Appellant.

Marlin & Saltzman, Louis M. Marlin, Dale A. Anderson, Alan S. Lazar and
Lynn P. Whitlock for Defendant and Respondent.

O'Melveny & Myers, Richard B. Goetz, Sabrina H. Strong and Carlos M. Lazatin for DePuy Mitek, Inc., and Johnson & Johnson as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**BAXTER, J.**—The Willed Body Program at the University of California at Irvine accepts human cadavers for scientific and anatomical studies. A donation agreement is the document by which an individual wills his or her own body, or the body of a deceased loved one, to the Willed Body Program. Prior to his death, plaintiff's husband, James Conroy, executed a donation agreement with the Willed Body Program for the donation of his body. Following his death on January 25, 1999, plaintiff Evelyn Conroy, his wife of more than 40 years, arranged for delivery of his body to the University of California at Irvine (UCI) in an unembalmed and unautopsied state, as specified in the donation agreement.

Some months later, plaintiff read newspaper reports of irregularities in the UCI Willed Body Program. These reports alleged that the program had failed to maintain adequate records of the human cadavers donated for teaching and research and that donated bodies could not be located. Plaintiff contacted UCI to inquire about her husband's body. She was informed that there were no records of what had happened to her husband's body after it was brought to the UCI medical school and that the body's whereabouts were unknown. Plaintiff suffered emotional distress over these revelations and over UCI's failure to notify her, as had been promised by Chris Brown, the director of the Willed Body Program at the time her husband executed the donation agreement, about a ceremony at sea to scatter her husband's ashes.

In 2000, plaintiff instituted this action against defendant The Regents of the University of California (the Regents) and others. The complaint alleged, inter alia, causes of action for negligence, fraud, and negligent misrepresentation. The trial court granted the Regents' motion for summary judgment on these claims, and the Court of Appeal affirmed. We affirm.

### BACKGROUND

On June 30, 1996, plaintiff Evelyn Conroy and her husband, James Conroy, each executed separate agreements to donate their bodies to the UCI Willed Body Program. James Conroy's agreement provided: "I here state that it is my wish to donate my body to the Department of Anatomy and Neurobiology, College of Medicine, University of California, Irvine (UCI), immediately following my death, for teaching purposes, scientific research, or

such purposes as the said University or its authorized representative shall in their sole discretion deem advisable. My body, when delivered to UCI, will be unembalmed and in good condition. It is further understood and agreed that final disposition of my body by UCI shall be in accordance with the State Code."

James Conroy died on January 25, 1999. After plaintiff notified their children of his passing, someone called UCI to arrange for delivery of the body. Sometime in September 1999, plaintiff read an article in the Orange County Register describing misconduct at the UCI Willed Body Program and telephoned UCI to inquire about her husband's body. About a month later, Dr. Peter Lawrence, the interim director of the Willed Body Program, returned her call. Dr. Lawrence stated that Chris Brown, the prior director, had failed to keep proper records and that UCI did not know what happened to her husband's body after it was picked up. Dr. Lawrence subsequently sent a letter confirming that her husband's body had been delivered to UCI but added that there was no further record of what happened to it.

Plaintiff then instituted this action against various parties, including the Regents, which administer the 10-campus University of California system, and asserted claims for breach of implied contract, negligence, negligent misrepresentation, breach of special duty, intentional infliction of emotional distress, and fraud and intentional deceit. In the complaint, plaintiff alleged that she, as the holder of the statutory right to control the disposition of her husband's body, had entrusted her husband's body to defendant under the Willed Body Program for purposes of teaching and research; that she was to receive her husband's remains "upon completion of the educational and research purposes" for which the donation was made; that plaintiff discovered in the fall of 1999 that defendant was using cadavers donated under the Willed Body Program for unauthorized purposes, including private for-profit tutoring classes and the transport and dismembering of bodies for profit; that defendant had failed to maintain records to ensure that the cadavers were used only for authorized purposes and to enable return of the remains to the appropriate family members; and that her husband's body "was misused in that the body was not used for medical research by the university." Plaintiff further alleged that she had suffered injuries to her health as well as emotional distress as a result of defendant's misconduct and sought compensatory and punitive damages.

The trial court sustained demurrers to the causes of action for breach of implied contract, breach of special duty, and intentional infliction of emotional distress. The Regents then moved for summary judgment on the remaining causes of action. In opposing the motion, plaintiff submitted a declaration recounting a telephone conversation she had had with Chris

Brown, who was then the director of the Willed Body Program, before her husband executed the agreement to donate his body. Brown had told plaintiff that her husband's body would be cremated and the ashes scattered at sea after UCI had completed its research, that the family would be notified "so that they could take an active part in the ceremony scattering the ashes at sea," and that she and her husband's physician would be advised of the medical findings pertaining to her husband's body. But after reading about misconduct at the Willed Body Program in an article published in the Orange County Register following the donation of her husband's body, plaintiff contacted Dr. Lawrence, the program's interim director, and learned that although her husband's body had been brought to the medical school, its subsequent whereabouts were unknown.

Plaintiff also submitted evidence that Brown had owned or colluded with several companies that profited from questionable dealings involving cadavers donated to the Willed Body Program. For example, Brown and Jeffrey Frazier were partners in a company, Replica, Inc., which offered a gross anatomy class called "Medbound" to students interested in attending medical school. The class was held on UCI premises without authorization from UCI, using cadavers from the Willed Body Program, and photographs of cadavers from the program were placed in Replica's storefront window. Plaintiff contended that these facts had put the Regents on notice of problems with the Willed Body Program prior to her husband's death that should have been, but were not, corrected.

In addition, plaintiff submitted evidence that Brown had arranged for the removal of seven cervical spines from cadavers, which he and Frazier then sold via another company, University Health Services, to a doctor conducting research at an Arizona hospital in June 1999. A subsequent audit of the Willed Body Program ordered by the dean of the UCI medical school revealed that there were no records concerning the final disposition of 320 of the 441 bodies donated between January 1, 1995, and August 11, 1999.

The trial court granted the Regents' motion for summary judgment. The Court of Appeal affirmed in a published opinion.

## Discussion

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party

opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) The materiality of a disputed fact is measured by the pleadings (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 212, p. 650), which "set the boundaries of the issues to be resolved at summary judgment." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648 [32 Cal.Rptr.3d 266]; see generally *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207] ["pleadings serve as the outer measure of materiality in a summary judgment proceeding"].) We find the Court of Appeal did not err.

### A. *The Cause of Action for Negligence*

█ In order to establish liability on a negligence theory, a plaintiff must prove duty, breach, causation, and damages. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11].) The complaint alleges that the Regents owed a duty of reasonable care with respect to the hiring, retention, training, and supervision of their agents and employees and the proper and respectful performance of all steps associated with the Willed Body Program, including the handling of James Conroy's body in an individual, proper, dignified, and lawful manner. The complaint contends that the Regents breached this duty by conducting or allowing to be conducted private, for-profit tutoring classes using donated bodies; by conducting or allowing to be conducted the transport of donated bodies for profit and the sale of donated body parts for profit; and by failing to ensure that use of the donated bodies conformed to the purpose of the donation. The complaint alleges also that the Regents committed a breach by failing to keep records pertaining to the identification of bodies requested to be returned to family members and by failing to return James Conroy's remains to plaintiff. According to the complaint, these breaches caused plaintiff emotional distress.

Plaintiff's claim is predicated on the assumption that use of cadavers in a private, for-profit tutoring class and the sale of body parts for profit is inconsistent with the terms of the donation agreement, which granted UCI the right to use the donated bodies "for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in

their sole discretion deem advisable." Amici curiae Depuy Mitek, Inc., and Johnson & Johnson urge us to find otherwise, pointing out that a donee "may, if he so desires, transfer his ownership to another person, whether the gift be of the whole body or merely a part" (8A West's U. Laws Ann. (2003) Anatomical Gift Act (1968) com. to § 7, pp. 146–147), and arguing that the sale of donated body parts is prohibited only in specified situations not present here. (See Health & Saf. Code, §§ 7051, 7158.3; Health & Saf. Code, former § 7155, subd. (a).)[1] We need not decide the precise contours of UCI's right to dispose of James Conroy's body, though, because the summary judgment record does not support the claim that the Regents mishandled James Conroy's body in the manner alleged in the complaint.

■ Plaintiff attempted to establish a pattern or practice of mishandling bodies donated to the Willed Body Program, citing the use of cadavers in the private Medbound class, Replica, Inc.'s window display of photographs of cadavers as advertisements for the Medbound class, the harvesting of seven cervical spines for an Arizona hospital in 1999, and a 1998 lawsuit alleging that the Willed Body Program had failed to comply with a provision in the donation agreement at issue there to return the cremated remains of loved ones when their bodies were no longer needed. However, there is no evidence in the record that James Conroy's body in particular was used in a private tutoring class, transported or dismembered for profit, or used in a manner other than what plaintiff contends was authorized by the donation agreement. This is fatal to plaintiff's claim. ■ As we have previously explained, "reports of a general pattern of misconduct are not sufficient, in and of themselves, to establish that defendants' misconduct included mishandling of the remains of each plaintiff's decedent. . . . [A]n allegation that a plaintiff suffered emotional distress on learning of that pattern of misconduct does not allege injury caused by a breach of a duty owed to the plaintiff[]." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 901 [2 Cal.Rptr.2d 79, 820 P.2d 181] (*Christensen*).) "A generalized concern that the remains of a relative may have been involved, arising out of a media report of a pattern of misconduct, is insufficient to satisfy the requirement that there be a direct connection between a defendant's conduct and the injury suffered by the plaintiff. It does not supply a necessary element—that the injury, here emotional distress, be caused by a breach of the defendant's duty to the particular plaintiff." (*Id.* at p. 902.) Our case law instead requires "a well-founded substantial certainty that his or her decedent's remains were among those reportedly mistreated." (*Ibid.*; see also *Bennett v. Regents of*

---

[1] In 2007, after the relevant events in this case, the Legislature repealed the 1987 version of the Uniform Anatomical Gift Act (Health & Saf. Code, former §§ 7150–7156.5; see Stats. 1988, ch. 1095, § 1, p. 3539) and reenacted a revised Uniform Anatomical Gift Act (Health & Saf. Code, §§ 7150–7151.40; see Stats. 2007, ch. 629, § 2). Citations are to the former act, unless otherwise noted.

*University of California* (2005) 133 Cal.App.4th 347, 359 [34 Cal.Rptr.3d 579].) No such evidence appears here.

Plaintiff contends that causation clearly exists here nonetheless, and relies on a passage in *Christensen* where we said that factors such as the source of a plaintiff's knowledge of misconduct, when that conduct cannot readily be observed, and the time at which such knowledge was acquired "go to the reasonableness of a plaintiff's claim to have suffered severe emotional distress and thus present issues for the trier of fact." (*Christensen, supra,* 54 Cal.3d at p. 902.) But the quoted excerpt from *Christensen* was premised on the inclusion of an allegation in the complaint there that the plaintiffs had "learned from the media reports that the remains of '*their*' decedents had been improperly treated," which was sufficient to resist a demurrer. (*Id.* at p. 901, italics added.) In light of that allegation, we did not question in *Christensen* "[t]he *ability* of each plaintiff to prove either that at the time the plaintiff learned of the misconduct he or she knew or had substantial reason to believe that the decedent was a victim of defendant's misconduct, or that the alleged continuing emotional distress each plaintiff suffers is based on knowledge that the decedent's remains have been mishandled." (*Ibid.,* italics added, fn. omitted.) Here, by contrast, we are reviewing a grant of summary judgment, and the record contains no evidence to support "a well-founded substantial certainty" that James Conroy's remains were among those reportedly mishandled. (*Id.* at p. 902.)

Indeed, as the Court of Appeal pointed out, the record refutes plaintiff's claim of mistreatment. "Because James Conroy did not pass away until January 1999, his body could not have been involved in the 1998 Medbound class, nor could it have been one of the bodies in the photographs taken down from Replica's storefront in July 1998. Similarly, the unspecified misconduct alleged in the June 1998 lawsuit necessarily predated its filing and therefore could not have involved James Conroy's body. [Plaintiff's] only specific allegation of mistreatment occurring when UCI had possession of her husband's body was the claim that in June 1999 Brown harvested seven spines from [Willed Body Program] cadavers for a doctor in Arizona. Nonetheless, she did not dispute the Regents' evidence that the spines were 'fresh tissue specimens from bodies that would have entered the [Willed Body Program] within a few weeks of the Arizona trip,' and hence none of the spines could have been from her husband because he died months earlier in January."

Plaintiff relies also on *Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797 [7 Cal.Rptr.2d 82], which she claims is "directly on point." Plaintiff has misread *Saari.* In that case, the plaintiffs had arranged for the defendant corporation to cremate the decedent's body and return the ashes without performing any religious service. In violation of the terms of the contract, the

defendant scattered the decedent's ashes at sea, performed a Christian religious service on his remains, and failed to release the ashes to the decedent's longtime companion. Then, in violation of a subsequent agreement with the decedent's longtime companion, the president of the defendant corporation, Richard Jongordon, contacted the decedent's mother and sister and informed them that the decedent's ashes had been scattered at sea following a religious service. (*Id.* at p. 801.) The decedent's mother testified that she suffered emotional distress because of the defendant's mishandling of her son's remains and because of her distrust of what Jongordon himself had said "about the actual disposition of her son's ashes," and that, among other emotional distress damages, she lay awake at night "wondering what had happened to her son's remains." (*Id.* at p. 806.) Relying on *Christensen*'s requirement that a plaintiff establish a well-founded substantial certainty of mistreatment, the defendant corporation argued that the mother's uncertainty—i.e., her distrust of Jongordon's account of what had happened to her son's body and her corresponding uncertainty as to the actual disposition of her son's remains—could not form the basis for recovery of damages for emotional distress. (*Saari, supra*, at p. 806.) The *Saari* court disagreed: "This speaks to a different matter than that raised in our case. The issue in *Christensen* was whether persons who were uncertain if their decedent's remains were actually mishandled could recover for emotional distress arising from this uncertainty. Saari's claim is not that she does not know *if* Robert's remains were mishandled, but that she is not certain what actual disposition was made of his ashes. As Saari's uncertainty does not raise any doubt about whether there was a breach of duty, *Christensen* does not preclude this basis of recovery for emotional distress." (*Saari, supra*, at p. 806.) The present case is unlike *Saari* in that plaintiff has not presented evidence that the Regents actually mishandled her husband's remains. Consequently, *Saari* is inapplicable.

Plaintiff would appear at first glance to be on firmer ground as to the allegation in her complaint that the Regents failed in their duty to return her husband's ashes to her, in that the record does indisputably show that his remains were not returned. However, the donation agreement did not specify that the remains were to be returned to plaintiff; rather, the agreement provided simply that UCI had a duty to dispose of the body "in accordance with the State Code." Other parts of the record confirm that plaintiff did not request or expect that the remains would be returned to her. Indeed, plaintiff's declaration in opposition to the motion for summary judgment admits that she expected instead to be notified of the scattering of ashes at sea so that she could participate in some way in the service. Defendant was therefore under no duty to return the remains.

Plaintiff's belated assertion in her declaration in opposition to the motion for summary judgment that the Regents failed to notify her of the scattering

of her husband's ashes does not establish error either. As stated above, the materiality of a disputed fact is measured by the pleadings. The complaint, which is the operative pleading here, alleged that the Regents had a duty to return her husband's remains, not that the Regents had a duty to notify her of the scattering of her husband's ashes so as to enable her to participate in some way in a service. The Regents, accordingly, had the burden on summary judgment of negating only those " 'theories of liability *as alleged in the complaint*' " and were not obliged to " ' " 'refute liability on some theoretical possibility not included in the pleadings,' " ' " simply because such a claim was raised in plaintiff's declaration in opposition to the motion for summary judgment. (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 332 [40 Cal.Rptr.3d 313].) " 'Declarations in opposition to a motion for summary judgment "are no substitute for amended pleadings." . . . If the motion for summary judgment presents evidence sufficient to disprove the plaintiff's claims, as opposed to merely attacking the sufficiency of the complaint, the plaintiff forfeits an opportunity to amend to state new claims by failing to request it.' " (*Id.* at p. 333; see also *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 182 [59 Cal.Rptr.3d 672] ["We do not require the Regents to negate elements of causes of action plaintiffs never pleaded."].)

Nor did the trial court err in granting summary judgment as to plaintiff's claim that the Regents breached their duty to her to maintain adequate records to ensure that the donated bodies were used in accordance with the purpose for which the donation was made. To the extent plaintiff premised such a duty on the Regents' concomitant duty to return her husband's remains, the claim fails, given that plaintiff now concedes that the Regents had no duty to return her husband's remains. To the extent plaintiff contends that the Regents owed her a duty to maintain records of her husband's body even in the absence of any duty to return his remains, we again disagree. Such a duty appears inconsistent with the donation agreement itself, which allows UCI to use the body "for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable" and which imposes no duty on UCI at the completion of its research except to dispose of the body "in accordance with the State Code." The Legislature does now require the donee to return the decedent's cremated remains, "unless the donor has previously designated otherwise in the document of gift" (Health & Saf. Code, § 7151.40, subd. (b)), but this provision applies only to donations made pursuant to a donation agreement executed after January 1, 2001 (see *id.*, former § 7154, subd. (d)), and we are loath to expand a donee's duties in this area beyond those the Legislature has provided. We note as well that plaintiff cites no authority for her assertion that the Regents, even in the absence of a duty to

return her husband's remains, owed her a continuing duty to comply with the Willed Body Program's own internal procedures concerning the tracking of cadavers.

■ Finally, we reject plaintiff's contention that her husband's donation of his body created "a duty to dispose of the remains in a manner that would not shock the sensibility to family members who enabled [UCI] to take possession of the [body] in the first place." Upon execution of the donation agreement and James Conroy's subsequent death, the statutory right to control the disposition of James Conroy's body passed to UCI. (Health & Saf. Code, former §§ 7150.5, subd. (h), 7154, subd. (a).) As the statutory right holder, UCI had "the exclusive right to control the disposition of the remains, and may do so in a manner offensive to other family members." (*Christensen, supra,* 54 Cal.3d at p. 891, fn. 19.) The only limitation was that imposed by the donation agreement itself, which provided that "final disposition of [the] body by UCI shall be in accordance with the State Code." State law, which specifically exempts UCI and other medical schools, hospitals, and public institutions from the Funeral Directors and Embalmers Law (Bus. & Prof. Code, § 7609), does not impose a duty on UCI to conduct its teaching and research in such a way as to safeguard the sensibilities of the surviving family members. "Even where not mishandled, bodies donated to the [Willed Body Program] are routinely subjected to treatment that could foreseeably cause emotional distress to family members. . . . But the Legislature has made a policy decision based on the importance of medical education and research that universities may act in the manner described above, and [has] expressly exempted them from the myriad of laws governing funeral directors." (*Melican v. Regents of University of California, supra,* 151 Cal.App.4th at p. 181.)

For these reasons, the order granting summary judgment was not erroneous as to plaintiff's negligence cause of action.

## B. *The Causes of Action for Fraud and Negligent Misrepresentation*

■ The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].) ■ The tort of negligent misrepresentation, a species of the tort of deceit (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407 [11 Cal.Rptr.2d 51, 834 P.2d 745]), does not require intent to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true. (*Small, supra,* 30 Cal.4th at pp. 173–174.)

The complaint alleges that the Willed Body Program, through its agents, represented that James Conroy's body would be used for research and teaching purposes (and not for gain or profit) and that the body would at all times be handled in a respectful and dignified manner. The complaint alleges further that these representations were false, in that defendant conducted or allowed to be conducted private, for-profit tutoring classes using donated bodies; conducted or allowed to be conducted the transport of bodies for profit and the sale of body parts for profit; failed to ensure that use of the bodies conformed to the purpose of the donation; failed to keep records pertaining to the identification of bodies requested to be returned to family members; and failed to return James Conroy's remains to plaintiff. Finally, the complaint alleges that defendant made these representations to induce plaintiff to participate in the Willed Body Program; that plaintiff, who was ignorant of the falsity of these representations, relied on them in electing to participate in the Willed Body Program; and that plaintiff suffered emotional distress as a consequence.

Once again, though, the summary judgment record does not support the allegations of the complaint. As discussed in the preceding section, there is no evidence in the record that James Conroy's body was used in a clandestine private tutoring class, transported or dismembered for profit, or used in any manner other than that specified in the donation agreement. Moreover, the record also reveals that plaintiff did not request or expect that her husband's remains would be returned to her. Because plaintiff failed to identify any false representations, the trial court did not err in granting summary judgment on the claims of fraud and negligent misrepresentation.

■ Plaintiff's claims fail for an additional reason: she has not shown that she actually relied on the alleged misrepresentations, which is an essential element of both claims of deceit. (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1088–1089 [23 Cal.Rptr.2d 101, 858 P.2d 568].) "Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable probability, have entered into the contract or other transaction." ' [Citations.] 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976–977 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

The actual donor in this case was the decedent, James Conroy, and it was he who executed the donation agreement. Plaintiff attempted to demonstrate

that her husband detrimentally relied on defendant's representations by reciting in her declaration that "[i]n reliance on Chris Brown's statements to me, my husband and I agreed to donate our bodies to UCI and to participate in the Willed Body Program." The trial court sustained the Regents' objection to this statement as speculative to the extent it purported to describe James Conroy's motivation and ordered the words "my husband" stricken from the declaration. Plaintiff did not challenge that ruling in the Court of Appeal or in this court.

■ In other words, the declaration now purports to say only that *plaintiff* relied on Brown's statements. (See *Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1037.) It is true, as plaintiff points out, that she delivered her husband's body "in a particular manner, i.e., unembalmed and unautopsied," and she claims she was "induced to do so in reliance upon the promises made by Chris Brown." But as the Court of Appeal observed, plaintiff "did not execute her husband's donation agreement, or make any decision regarding disposition of his body" and thus "had no legal right to control the disposition of her husband's body." The right of plaintiff, as the surviving spouse, to control the disposition of her husband's body was superseded by the terms of the written donation agreement executed by her husband. (Health & Saf. Code, former § 7154, subd. (a) ["Rights of a donee created by an anatomical gift are superior to rights of others . . . ."]; see also *id.,* § 7100.1, subd. (a); see generally 8A West's U. Laws Ann., *supra,* Anatomical Gift Act (1987) prefatory note, p. 6 ["consent of next of kin after death is not required if the donor has made an anatomical gift"].) That agreement recited that James Conroy's body was to be donated to UCI "immediately" following his death and that the body, when delivered, was to be "unembalmed and in good condition." Those instructions were to be "faithfully carried out upon his . . . death" and could not be "altered, changed, or otherwise amended in any material way, except as may be required by law." (Health & Saf. Code, § 7100.1, subd. (a).) Plaintiff has not identified any legal basis for altering her husband's instructions.

Accordingly, although plaintiff did deliver her husband's body to UCI, her actions are not cognizable as *reliance* for purposes of a claim of deceit, inasmuch as her husband's gift was already "irrevocable" upon his death. (Health & Saf. Code, former § 7150.5, subd. (h).) Plaintiff did not enter into an agreement with UCI regarding her husband's body, nor did Brown's representations cause her to alter her legal relations with UCI. James Conroy's gift of his body in an unembalmed and unautopsied condition, as specified in the donation agreement, did not require her "consent," "concurrence," or "approval." (*Id.,* former § 7150.5, subds. (h), (*l*); see 8A West's U. Laws Ann., *supra,* Anatomical Gift Act (1987) com. to § 2, pp. 26–27 [the Uniform Act " 'recognizes and gives legal effect to the right of the individual to dispose of his own body without subsequent veto by others' "].)

For these reasons, the order granting summary judgment was not erroneous as to plaintiff's fraud and negligent misrepresentation causes of action.

**DISPOSITION**

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.