KELLY, Circuit Judge,
dissenting.
This court affirms the district court on alternative grounds: that Mr. Alioto’s claim for legal services performed for Mr. Hoiles’s ex-wife and daughters (the Family Shares Issue) is a related matter and thus the Fee Agreement (Agreement) is voidable. The court further holds that Mr. Hoiles did not ratify the Agreement prior to voiding it, so the district court correctly reinstated the quantum meruit verdict.
I must disagree. In my view, the court’s resolution ignores the essence of an attorney-client relationship. I would reverse the district court’s judgment and remand for the district court to award Mr. Alioto 15% of the amount received by Mr. Hoiles for his shares and only his shares.
Mr. Hoiles contends that there are several related matters under Cal. Bus. & Prof.Code § 6147(a)(3). I agree with the district court that Mr. Alioto’s attempt to *858 claim fees for ostensible representation of the Family Shares is not a related matter. I disagree with the district court that Mr. Alioto’s attempt to collect 20% from Mr. Hoiles based on an alleged oral modification of the Agreement (the 20% Issue) is a related matter. Further, Mr. Alioto’s claim to fees for the recapitalization of Freedom (the Recapitalization Issue) is not a related matter because he was entitled to recover for efforts other than litigation. Because there are no related matters, the Agreement was not voidable under § 6147(b). Turning to the alternative grounds raised by Mr. Hoiles for invalidating the Agreement, I would reject them. Finally, I would conclude that Mr. Alioto cannot recover for the Family Shares under his fraud and misrepresentation claims as a matter of law. This results in a recovery for Mr. Alioto of 15% of the amount received by Mr. Hoiles for his shares.

A. There Are No Related Matters

1. The Family Shares Issue

The Family Shares Issue is a “matter,” but it is not “related” within the meaning of § 6147(a)(3). The court looks to the California Supreme Court’s decision in Bay Cities Paving & Grading, Inc. v. Lawyers’ Mut. Ins. Co., which defines “related” as “standing in relation; connected; allied; akin” and having “a causal connection as well as the ‘notion of similarity.’ ” 5 Cal.4th 854, 868, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (Cal.1993). But that definition must be read in context. The Bay Cities court held that two claims against an attorney were “related” because, inter alia, “[t]hey arose out of the same specific transaction.... [and] arose as to the same client.” Id. at 873, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (emphases added).
The district court found no evidence that Mr. Alioto was retained to represent Mr. Hoiles’s ex-wife and daughters. No other conclusion is possible because no evidence supported the theory that Mr. Hoiles had any authority to act on their behalf. See IV App. 1196. Thus, as recognized by this court, the fee agreement simply does not cover the Family Shares. It follows ineluctably that Mr. Alioto’s attempt to collect for the legal services he allegedly performed for the ex-wife and daughters cannot be “related” to his representation of Mr. Hoiles.
First, any representation of the ex-wife and daughters cannot have “ar[isen] of out the same specific transaction” as Mr. Alio-to’s representation of Mr. Hoiles. Bay Cities, 5 Cal.4th at 873, 21 Cal.Rptr.2d 691, 855 P.2d 1263. The Agreement only covers Mr. Hoiles and his shares. Second, while the attorney may be the same, the client and the ostensible clients (Mr. Hoiles vs. his ex-wife and daughters) are totally different. The issues here plainly did not arise as to the same client. See id.
For the same reasons, I would hold that the Family Shares Issue did not “arise out of [Mr. Hoiles and Mr. Alioto’s attorney-client] relationship.” § 6147(a)(3). The attorney-client relationship is a special and voluntary one, founded upon consent and replete with fiduciary duties and ethical obligations owed by the attorney to his client. Here, the ex-wife and daughters did not consider themselves to be Mr. Alio-to’s clients. See, e.g., III App. 961-62, 966; IV App. 1090. Moreover, Mr. Hoiles never purported to represent them or act as their agent in his dealings with Mr. Alioto. See, e.g., III App. 754, 762, 803, 843, 850-51, 872, 946; IV App. 1159; V App. 1679-83 (answering “No,” to the question: “[D]id you, at any time, ever have any kind of agency relationship ... representing the interests of your former wife and your two daughters ... ?”). Mr. Alioto might have believed he was representing the ex- *859 wife and daughters, but a lawyer’s unilateral, subjective belief does not create an attorney-client relationship. See Kerner v. Super. Ct., 206 Cal.App.4th 84, 141 Cal.Rptr.3d 504, 580 (2012). Therefore, because the Fee Agreement never covered the ex-wife and daughters or their shares, the Family Shares Issue cannot have arisen out of Mr. Hoiles and Mr. Alioto’s attorney-client relationship. See, e.g., Thayer v. Kabateck Brown Kellner LLP, 207 Cal.App.4th 141, 143 Cal.Rptr.3d 17, 32 (2012) (“An attorney who undertakes to represent one spouse does not become the legal representative of that client’s wife....”).
Indeed, this conclusion is supported by the matters the California Court of Appeals has found to be “related” — an attorney’s efforts to collect on a judgment and an attorney’s post-settlement work. See Shumake v. Schwam, No. B1999587, 2008 WL 4458164, at *5 (Cal.Ct.App. Oct. 6, 2008) (time spent collecting the judgment); Tishgart v. DeJesus, No. A104244, 2004 WL 1941193, at *3 (Cal.Ct.App. Aug. 31, 2004) (post-settlement work). Both involved incidental legal services performed by the same attorney for the same client. Thus, they arose out of the same attorney-client relationship.
This conclusion in no way undermines § 6147(a)’s goal of protecting the client. The statute requires contingency fee agreements to be in writing, which implies they include the name of the client and the attorney. The Fee Agreement complied with this requirement — it set forth the client (Mr. Hoiles) and the attorney (Mr. Alioto). Therefore, Mr. Hoiles was not misled as to whom Mr. Alioto represented and § 6174(a) indeed protected Mr. Hoiles from being held responsible for the work Mr. Alioto allegedly performed on behalf of the ex-wife and daughters.

2. The 20% Issue

Under Section 6147(a)(3), a “matter” must be some form of compensable legal service for the client outside the scope of representation contained in the agreement. Here, the 20% Issue is not a legal service and therefore is not a “matter” under § 6147(a)(3). Rather, it is an alleged oral modification of the Fee Agreement, in particular, the fee percentage.
Again, this conclusion is supported by the issues the California Court of Appeals has found to be “related matters:” distinct ancillary legal services for which an attorney can be compensated. See Shumake, 2008 WL 4458164, at *5; Tishgart, 2004 WL 1941193, at *3. Thus, “claims for property damage, workers’ compensation, disputes with a health care provider about the amount owed for their services, or claims for reimbursement (subrogation) by any insurance company for benefits paid under an insurance policy” are related matters where the scope of representation is confined to representing the client in pursuing a personal injury tort claim. See State Bar of California, Sample Written Fee Agreement Forms, Form No. 3 at 25 (last amended Nov. 19, 2010).
Mr. Alioto apparently felt justified in enforcing the otherwise invalid modification because of, inter alia, his perception that the work became more difficult when Mr. Hoiles insisted on seeking a fair value for all shareholders in order to obtain a fair value for his own shares. In some cases, there may be a fine line between a change in the scope of the work required by a client’s demand and a related matter, as both may involve legal services. But this is not such a case because the 20% Issue simply is not a change in the scope of the representation between Mr. Hoiles and Mr. Alioto. Rather, it is an alleged oral modification of the Fee Agreement justified in part by the additional work *860 created by the client’s settlement posture within the same matter. At all times Mr. Alioto’s “compensable legal service” remained the same: he worked to obtain the best price possible for Mr. Hoiles’s shares on terms Mr. Hoiles would accept.
Again, this conclusion is consistent with the purpose of § 6147(a), which requires contingency fee agreements to be in writing and to contain statements (1) of the agreed upon contingency fee rate, (2) as to how disbursements and costs incurred in the representation will affect the contingency fee and the client’s recovery, (3) as to when clients could be required to pay compensation to the attorney for related matters arising out of their relationship not covered by the contingency fee agreement, and (4) that the fee is negotiable between the parties and not set by law. Obviously, the relevant time period is the time the agreement is signed as none of these requirements protects the client if it is not followed at the time the parties execute the agreement. Alderman v. Hamilton, 205 Cal.App.3d 1033, 252 Cal.Rptr. 845, 847 (1988) (“Attorney fee agreements are evaluated at the time of their making.”). Here, the 20% Issue pertains to the requirement that a contingency fee agreement contain the agreed upon contingency rate in writing. The Agreement complied with that requirement at the time it was executed; it set forth the agreed upon contingency fee rate — 15% of anything recovered before the filing of a complaint, 20% of anything recovered after the filing of a complaint but before the start of trial, and 25% of anything recovered after the start of trial. It is these percentages that are legally enforceable, not the alleged oral modification. Mr. Hoiles was not misled by the Agreement as to the applicable fee percentage at the time it was executed — indeed, § 6147(a) fully protected Mr. Hoiles from being bound by a subsequent oral modification of that fee percentage.[1] See Stroud v. Tunzi, 160 Cal.App.4th 377, 72 Cal.Rptr.3d 756, 761-62 (2008) (“[Mjaterial changes to a contingency fee agreement must comply with section 6147,” but there is “no authority that invalid modifications to a contract nullify the contract.”).

3. The Recapitalization Issue

In arguing the Recapitalization Issue is a related matter, Mr. Hoiles relies on the simple assertion that he hired Mr. Alioto to litigate. For support, he points to the Agreement, which entitles Mr. Alioto to a certain percentage of “anything recovered.” I App. 85. Mr. Hoiles says the term “anything recovered” contemplates a settlement or judgment in litigation (which never occurred) and “not an unforeseen recapitalization and private stock sale to a third party that was available to all Freedom shareholders” which resulted from the work of the Special Committee, not Mr. Alioto’s actions. Aplee. Br. 30-31.
But the Agreement’s plain language allows Mr. Alioto to recover a 15% contingency fee for “anything recovered before the filing of a complaint.” I App. 85. Obviously and understandably, the Agreement contemplates representation outside of litigation. Moreover, the Agreement states that Mr. Alioto would be representing Mr. Hoiles in the “Freedom Communications Matter.” Id. That term is not defined in the Agreement and is ambiguous. Nevertheless, looking to the undisputed extrinsic evidence, it appears both parties understood Mr. Alioto was being retained to assist Mr. Hoiles in divesting *861 himself of his Freedom stock for a fair price, not necessarily to file a lawsuit. In fact, Mr. Hoiles admits he hired Mr. Alioto “for the purpose of advising and representing [him] and possibly filing a lawsuit in an effort to get a fair market price for [his] shares.” Ill App. 858 (emphasis added). Therefore, the Recapitalization Issue is covered by the Agreement.[2]

B. Mr. Hoiles’s Alternative Arguments that the Agreement Is Unenforceable Are Unavailing

Mr. Hoiles claims that even if there are no related matters and the Agreement complies with § 6147(a)(3), it nevertheless is unenforceable because (1) it violates California Business & Professions Code § 6148 and Rule 3-300 of the California Rules of Professional Conduct, (2) it is unconscionable, (3) the contingency never occurred, and (4) Mr. Alioto did not “cause” a recovery. Aplee. Br. 48-53. I am not persuaded.

1. Section 6118 and Rule 3-300

Section 6148 lists several requirements for attorney fee contracts “not coming within Section 6147.” Because the Fee Agreement falls within § 6147, § 6148 does not apply here. That is true even though the Fee agreement contains an hourly fee provision. See Arnall v. Super. Ct., 190 Cal.App.4th 360, 118 Cal.Rptr.3d 379, 381, 387 (2010) (§ 6147 applies to “hybrid” fee agreements providing for a fixed monthly stipend and a variable “success fee”). The same result ensues with Rule 3-300, which forbids, inter alia, an attorney from acquiring an ownership interest adverse to a client unless certain conditions are met. The comments to the Rule clarify that it “is not intended to apply to the agreement by which the [attorney] is retained by the client, unless the agreement confers on the [attorney] an ownership, possessory, security, or other pecuniary interest adverse to the client” but does apply “where the [attorney] wishes to obtain an interest in [the] client’s property in order to secure the amount of the [attorney’s] past due or future fees.” The California courts have indicated Rule 3-300 does not apply in the contingency fee agreement context even if it includes a charging lien. See Plummer v. Day/Eisenberg, LLP, 184 Cal.App.4th 38, 108 Cal.Rptr.3d 455, 464 (2010) (“A contingency fee agreement ... need not comply with rule 3-300 to create an attorney’s lien” because “charging liens are not only inherent in contingency fee contracts, they are almost universally found and almost universally uncontroversial in such contracts” (quotation omitted)). In any event, the Agreement entitles Mr. Alioto to a percentage of “anything recovered.” While the Agreement could conceivably have given him an interest in Mr. Hoiles’s property had Mr. Hoiles received some type of property in exchange for his shares, it is undisputed that Mr. Hoiles wanted his shares liquidated at a fair price. And all Mr. Alioto is seeking is a percentage of the proceeds Mr. Hoiles received from the recapitalization.

2. Unconscionability

Rule 4-200(B) of the California Rules of Professional Conduct describes the factors relevant to determining whether a particu *862 lar legal fee is unconscionable; fee agreements which violate this rule may be deemed unenforceable on public policy grounds. Cotchett, Pitre & McCarthy v. Universal Paragon Corp., 187 Cal.App.4th 1405, 114 Cal.Rptr.3d 781, 790-91 (2010). It states: “Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events.” Rule 4-200 sets forth factors to be considered in determining the unconscionability of a fee:
(1) The amount of the fee in proportion to the value of the services performed. (2) The relative sophistication of the member and the client. (3) The novelty and difficulty of the questions involved and the skill required to perform the legal service properly. (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member. (5) The amount involved and the results obtained. (6) The time limitations imposed by the client or the circumstances. (7) The nature and length of the professional relationship with the client. (8) The experience, reputation, and ability of the member or members performing the services. (9) Whether the fee is fixed or contingent. (10) The time and labor required. (11) The informed consent of the client to the fee.
“[A] fee that seems high or even one that is in fact high is not the same as an unconscionable fee.” Aronin v. State Bar, 52 Cal.3d 276, 276 Cal.Rptr. 160, 801 P.2d 403, 407 (1990) (quotation omitted).
The above factors weigh against a finding of unconscionability. Mr. Hoiles does not contest Mr. Alioto’s claim that he is a highly experienced and skilled antitrust attorney. II App. 533; III App. 729-30, 786, 835, 850. At the time the Agreement was entered into, Mr. Alioto’s representation of Mr. Hoiles could potentially have involved numerous hours and a lengthy litigation process. II App. 457. Mr. Alio-to took a risk in taking on the representation. While the end result was very favorable (itself a factor weighing against unconscionability), Mr. Hoiles’s father had failed in a previous effort to dissolve Freedom. Id; III App. 781-82, 846-47. Mr. Hoiles was not an unsophisticated client and had at least one attorney (if not three) working with him when the Agreement was negotiated. II App. 508-09; III App. 814-16, 841; V App. 1632-33. And Mr. Hoiles was the one who insisted on a contingency fee arrangement. III App. 736, 784-85.

3. “Anything Recovered”

As discussed above, Mr. Hoiles’s argument that “anything recovered” requires a settlement or judgment is belied by the Agreement which allows for a contingency fee for “anything recovered before the filing of a complaint.” Moreover, Mr. Alioto agreed to represent Mr. Hoiles in the “Freedom Communications matter.” That term may be ambiguous, but looking to the extrinsic evidence it appears both parties, including Mr. Hoiles, understood Mr. Alio-to was being retained to assist Mr. Hoiles in divesting himself of his Freedom stock for a reasonable price. Ill App. 858. It follows then that “anything recovered” means anything Mr. Hoiles recovered for his stock.

I. Causation

Contrary to Mr. Hoiles’s argument, nothing in the Agreement requires it to have been Mr. Alioto’s efforts which caused the recovery. And obviously, as evidenced by the jury’s quantum meruit award, Mr. Alioto did perform work on the *863 Freedom Communications matter on Mr. Hoiles’s behalf. See Strong v. Beydoun, 166 Cal.App.4th 1398, 83 Cal.Rptr.3d 632, 635 (2008) (“Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered .... The burden is on the person making the quantum meruit claim to show the value of his or her services and that they were rendered at the request of the person to be charged.” (quotation omitted)). Moreover, Mr. Hoiles admitted in a letter to his ex-wife and daughters that it was Mr. Alioto’s efforts, at least in part, that resulted in Freedom’s recapitalization. See III App. 946 (“I truly believe that if we obtain a positive result it is in fact due to the work of Joe Barletta, Mr. Alioto, and the team (appropriately nicknamed ‘the posse’) he assembled and Christopher Shaw.”).

C. Mr. Alioto’s Fraud and Misrepresentation Claims

Mr. Alioto also argues he is entitled to recover from Mr. Hoiles a portion of the monies received for the Family Shares under his fraud and negligent misrepresentation claims. According to Mr. Alioto, Mr. Hoiles told him at their first meeting and throughout the representation that Mr. Hoiles was acting on behalf of the Family Shares. Mr. Hoiles argues that both claims fail because (1) there is no evidence Mr. Alioto justifiably relied on Mr. Hoiles’s alleged oral representations that he was authorized to act on behalf of his ex-wife and daughters or that he would pay a contingent fee based on 15% of the monies they received and (2) Mr. Alioto cannot show damages. The latter argument defeats Mr. Alioto’s recovery.
Both fraud and misrepresentation require the plaintiff to show damages. Conroy v. Regents of the Univ. of Cal., 45 Cal.4th 1244, 91 Cal.Rptr.3d 532, 203 P.3d 1127, 1135-36 (2009). Out-of-pocket and benefit-of-the-bargain are two measures of damages:
The out-of-pocket measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The benefit-of-the-bargain measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.
Alliance Mortg. Co. v. Rothwell, 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601, 609 (1995) (quotations omitted). “In California, a defrauded party is ordinarily limited to recovering his out-of-pocket loss....”[3] Id. (quotation omitted); see also Kenly v. Ukegawa, 16 Cal.App.4th 49, 19 Cal.Rptr.2d 771, 773 (1993). Because Mr. Hoiles paid all expenses, Mr. Alioto has no out-of-pocket losses. Thus, the fraud and misrepresentation claims fail as *864 a matter of law.[4]
In short, I would hold that the Fee Agreement is valid and enforceable, but applies only to Mr. Hoiles and his shares. Therefore, Mr. Alioto’s recovery is limited to 15% of the amount received by Mr. Hoiles for his shares.

. Recognizing die invalidity of the oral modification, Mr. Alioto has not sought 20% under the contract in this litigation.

. Mr. Hoiles cites to several California cases defining "recovery” as a settlement or judgment in litigation. These cases are inappo-site. First, the relevant term in the Fee Agreement is “anything recovered” not “recovery.” Second, while recovery may mean a settlement or judgment in litigation in some contexts, the relevant context here is a specific fee agreement, which could not be clearer that it contemplates recovery outside of litigation.

. An exception exists when the defrauding party stands in a fiduciary relationship with the victim of the fraud. In such circumstances the victim is entitled to both out-of-pocket expenses and benefit-of-the-bargain damages. See Alliance Mortg. Co., 44 Cal.Rptr.2d 352, 900 P.2d at 609-10 (collecting cases). Here, because Mr. Hoiles (the alleged defrauding party) was not Mr. Alioto's fiduciary, the exception is not applicable.

. In the first appeal in this case, we said California law allows a plaintiff to recover benefit-of-the-bargain damages for fraud. Hoiles, 461 F.3d at 1236 n. 7. In doing so, we relied on Robinson Helicopter Co. v. Dana Corp., 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004), which in turn relied on Lazar v. Super. Ct., 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). But further review of Lazar reveals it was taken out of context. While not a model of clarity, Lazar only allowed both sets of damages because the plaintiff had both a contract claim and a tort claim. See 49 Cal.Rptr.2d 377, 909 P.2d at 992. The California Supreme Court clarified this in Simon v. San Paolo U.S. Holding Co., 35 Cal.4th 1159, 29 Cal.Rptr.3d 379, 113 P.3d 63 (2005). There, the plaintiff cited Lazar for the proposition that fraud plaintiffs may recover benefit-of-the-bargain as well as out-of-pocket damages. Id., 29 Cal.Rptr.3d 379, 113 P.3d at 73 n. 4. The Court said that reliance was misplaced: "[0]ur reference in that decision to benefit-of-bargain damages was to their recovery under a contract cause of action.” Id.; see also Roberts v. Redlands Centennial Bank, Nos. E028775, E029235, 2002 WL 1529614, at *10 (Cal.Ct.App. July 15, 2002) (unpublished) (same). This court is obligated to follow correct California law and is not bound by our previous interpretation of that law. See Homans v. City of Albuquerque, 366 F.3d 900, 904 n. 5 (10th Cir.2004) ("Dicta is not subject to the law of the case doctrine.”); see also Christianson v. Colt Indus. Oper. Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (prior decision regarding jurisdiction not binding where "clearly wrong”).