Filed 2/3/16  Enea v. California Culinary Academy CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARIE ENEA, ET AL., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA CULINARY ACADEMY, INC., ET AL., <br><br> Defendants and Respondents. | A141886 <br><br> (San Francisco City and County Super. Ct. No. CGC-13-532476) |

The issue presented by this appeal is whether plaintiffs have sufficiently alleged a community of interest so as to maintain a putative class action past the pleading stage.

Plaintiffs sued defendants in the San Francisco City and County Superior Court. They alleged that as a result of numerous misrepresentations they and a putative nationwide class were wrongly induced to become cosigners for, or direct borrowers of, loans for students attending defendant California Culinary Academy (CCA), located in San Francisco, California, from 2003 to 2008.  They appeal from the trial court's order granting defendants' motion to strike all class allegations from their second amended complaint (SAC).  We conclude plaintiffs' SAC allegations raise statute of limitations issues that necessarily require individualized inquiries into the liability of many, if not all, putative class members.  As a result, there is no reasonable possibility plaintiffs can establish a community of interest among its proposed class because individual issues predominate over common questions of law and fact.  Therefore, we affirm the trial court's order.

1

## BACKGROUND

Plaintiffs Marie Enea, Laura Daviton, James Grisham, Gregory Irby, Linda Nelson, Ersie Jean Smith and Bruce Strassel filed an initial complaint on June 27, 2013, then filed a first amended complaint and their SAC.

In their SAC, plaintiffs sued on behalf of themselves and a putative nationwide class of parents, family and friends of attendees and graduates of CCA between January 1, 2003, and December 31, 2008. The class consisted of cosigners of student loans and direct borrowers of loans (such as "Parent Plus" loans) to pay tuition and costs for CCA students. Plaintiffs asserted this class was "not fewer than several thousand class members" dispersed throughout California and the rest of the United States.

Plaintiffs sued defendants CCA, a California corporation, and CEC, a Delaware corporation and CCA's parent company, which allegedly exercised complete dominion and control over CCA. They also sued SLM Corporation (SLM), which originated, serviced, and purchased the loans cosigned by plaintiffs, and Sallie Mae, Inc. (Sallie Mae), a subsidiary of SLM that serviced the loans cosigned by plaintiffs.

## I.

### *Plaintiffs' Allegations*

Plaintiffs alleged eight causes of action against defendants: for equitable indemnity (against CCA and CEC only), declaratory relief, intentional misrepresentation, negligent misrepresentations, violations of California's Unfair Competition Law (UCL, Bus. & Prof. Code, § 17200, et seq.), the Consumer Legal Remedies Act (CLRA, Civ. Code, § 1750 et seq.) and the Reform Act (former Educ. Code, § 94700 et seq.), and treble damages under Penal Code section 496, subdivision (c). These causes of action were based on the following allegations:

During the period in question, CCA offered various programs to its students, including degrees and certificates in the culinary and baking and pastry arts. It operated its school under a license agreement with Le Cordon Bleu, "an internationally recognized name in the culinary industry." Although CCA used the "Le Cordon Bleu moniker as an inducement to potential students to enroll," it violated the terms of the license, including

2

regarding "class-size limitations, promises to ensure students are provided with all necessary support systems, and requirements that certain levels of skill be attained by graduates."

CCA marketed its programs to students and their cosigners through an extensive advertising campaign that included television, radio, print, Internet and direct mail advertisements and in-person recruitment. It "saturated the Internet" with "advertising [that] made it difficult for students to find independent and unbiased information about the school." It "routinely" represented in its marketing materials and presentations that its programs led to true "Chef" positions, and emphasized that such positions had dramatically higher salaries than other salaries in the industry, such as those of cooks.

All CCA applicants were required to "interview," often accompanied by cosigners. These interviews "were a ruse," "carefully scripted sales presentations" conducted by salespeople whose "scripts were highly manipulative, not only of applicants but of applicants' families and cosigners as well." The interviews were "specifically and carefully designed to require each salesperson to mislead each prospective student and their cosigners into believing the school was selective, that admissions were competitive," and that CCA was a highly respected institution "that the applicants would be lucky to attend." The salespeople also used flip charts that suggested graduates would avoid low paying jobs and long hours. These were false representations. Salespeople had quotas to fill, and committed fraudulent acts to meet them.

CCA presented inflated placement statistics for its graduates, which it supported "with representations that its graduates had a strong track record of successful placements, and [that] CCA culinary programs were a good investment." However, these statistics included placements in "any position in the 'hospitality' industry," and "reflected almost entirely jobs paying $12 an hour or less." Also, CCA catalog addenda stated inflated placement rates that were higher than those CCA stated in its "How Our Students Are Doing" forms, which it was legally required to provide to students, and which it wrote with confusing language.

CCA also represented to students and cosigners that it had an aggressive job placement agency with a great placement track record, and which provided support to graduates throughout their careers. This too was false. "Because Plaintiffs reasonably understood these placement rates to refer to 'Chef' positions (when they did not) and to positions paying high wages that these jobs did not pay, the placement statistics were grossly false and misleading."

"It was the policy, pattern, and practice of CCA to make each of [its] misrepresentations to each prospective applicant to induce them to attend CCA, and to the cosigners to induce them to cosign for the students." CCA knew its representations, whether in print, online, on video or in person, were false and/or misleading and/or had no reasonable grounds for believing them to be true.

Further, CCA had a legal duty to disclose certain facts to applicants so that they were not deceived by CCA's representations, but CCA did not disclose these facts. These included that CCA was not at all selective and had no admissions committee; had a poor reputation in the food service industry; published inflated, inaccurate, false and/or misleading job placement rates; had a vast majority of graduates who could only find jobs in the culinary industry working in entry level positions rather than Chef jobs; included in its placement statistics people working at jobs in which "there was a slight intersection between the job and the [CCA] training"; was not committed to the students' careers; and did not provide lifetime career services support.

In short, CCA knew a CCA degree was not a good investment. Further, it knew its school was so expensive that students typically had no choice but to accept the loans arranged for them by CCA, and no choice but to obtain a cosigner for their loans. It also knew that, with rare exceptions, CCA graduates did not earn enough money working in culinary jobs to repay their student loans and otherwise pay even very modest living expenses. Yet, CCA told prospective students and their cosigners that the students could expect to service and pay off their CCA loans within a reasonable period of time and provided misleading written information indicating this was the case.

4

CCA's misrepresentations were "intended to deceive the cosigners," who were "often present" with students during CCA's misleading presentations and "typically spoke with CCA employees directly, and reviewed CCA's website and promotional materials." The cosigners reasonably relied on CCA's misrepresentations, whether made to the cosigners directly or via the students. CCA knew or reasonably should have known that the cosigners would rely on CCA's lies and omissions when they agreed to guarantee the debts of students. Had CCA told the truth, the students would have not taken out the loans and the cosigners would not have cosigned for such "enormous debts on outrageous terms."

Plaintiffs also alleged that they and the putative class had "only recently beg[u]n experiencing damages as a result of Defendants' conduct. CCA students often applied for and were granted deferments on their loans, allowing them to delay the start date of their student loan payments . . . . Sallie Mae has now recently begun attempting to collect on these student loans from the cosigners, including Plaintiffs."

Plaintiffs also alleged that the superior court had, in a prior action brought by CCA students only, entered an order granting final approval of a class action settlement and plaintiffs' motion for attorneys' fees and costs (*Amador* action). The allegations of the *Amador* action were "substantially similar" to the allegations in the present complaint.

Plaintiffs asserted that common questions of law and fact existed as to all members of the putative class and predominated over questions affecting individual members. These included whether CCA had a pattern and practice of misrepresenting its placement statistics, admissions process, reputation and career services for graduates, and of not disclosing certain concealed facts; whether CCA intended to mislead plaintiffs and the class with its misrepresentations and concealments; and whether plaintiffs and the class suffered injury and damages as a result.

## II.

### *Defendants' Motion to Strike*

In November 2013, CCA and CEC filed a motion to strike all of the class allegations in the SAC and a demurrer, which motion and demurrer were joined by defendants SLM and Sallie Mae. In their motion to strike, defendants asserted that "a class cannot be certified because the SAC, on its face, demonstrates that individual factual and legal issues predominate," and requested excision of all references to a "class." They argued a class could not be certified because determining what information each putative class member heard or saw would require individualized inquiries; various statutes of limitations either barred plaintiffs' claims or required individualized inquiries into when the plaintiffs discovered the alleged misrepresentations in order to determine when their individual claims accrued; and that individual choice-of-law issues predominated.

In opposition, plaintiffs argued that class certification issues should not be decided at the pleading stage; common issues predominated, just as in the *Amador* action; the statute of limitations issues did not bar class certification because the cosigners only recently had incurred damages when Sallie Mae had begun pursuing them, making the "discovery rule" irrelevant; and there was no reason to suspect that anything other than California law would apply to all of the plaintiffs' claims.

The trial court granted defendants' motion to strike. The court observed that "plaintiffs recite more than twenty separate allegedly fraudulent representations . . . from various sources in a variety of contexts and in an array of media. . . . Thus, it is a panoply of oral [and] written representations, about which the complaint is made." The court concluded that "whether the representations were read or heard, whether they are even actionable, whether class members reasonably relied on those representations, whether those representations caused class members to co-sign the loans, and whether class members were damaged, all require individualized inquiries and are not susceptible to common methods of proof." (Footnote omitted.)

6

The court also stated that the statute of limitations issues raised "further questions that would require individualized inquiries to resolve," since plaintiffs stated a class period that ended in 2008, more than four years before they commenced the action in 2013. The court also thought plaintiffs' theory that any statute of limitations would not begin to run until a purported class member's damages actually occurred was at odds with class certification, as it too would require individualized inquiries into when each student exhausted his or her deferments, and when lenders pursued co-signers. The court reasoned: "The alleged class period begins January 1, 2003. There are purported class members whose claims may already be barred by the statute of limitations. There are purported class members whose claims may not be so barred. Then there are purported class members whose claims may not yet be ripe, and may never ripen. Determining who falls into which category would require individualized inquiries."

The court concluded: "[T]he impropriety of the class allegations is revealed on the face of the operative complaint. It is clear from those allegations that there is no reasonable possibility that plaintiffs can establish a community of interest among the potential class members because individual issues predominate over common questions of law and fact."

Regarding defendants' demurrers, the trial court at first sustained it without leave to amend. After plaintiffs moved for reconsideration, the court granted them leave to amend the declaratory relief, intentional misrepresentations, negligent misrepresentations and UCL causes of action, albeit without the class allegations. Plaintiffs do not challenge these demurrer and motion for reconsideration rulings and we, therefore, do not discuss them further.

Plaintiffs filed a timely notice of appeal from the court's order striking its class allegations. During the pendency of this appeal, CCA and CEC asked that we take judicial notice of a ruling in *Vasquez et al. v. California School of Culinary Arts Inc., et al.*, Los Angeles County Superior Court Case No. BC393129. We hereby deny that request because it is not relevant to the issues dispositive of this appeal.

In a joinder filed with this court on January 30, 2015, Navient Corporation and Navient Solutions, Inc. represent that they are the entities formerly known as named defendants SLM Corporation and Sallie Mae, Inc. respectively, and that they join in the respondents' brief filed by CCA and CEC.

## DISCUSSION

Plaintiffs argue we should reverse the trial court's order and remand for further proceedings. They contend their SAC adequately alleged that putative class members relied on CCA's misrepresentations, if only because this court can and should infer, pursuant to an "indirect reliance" theory, that class members who did not directly receive these misrepresentations justifiably relied on misrepresentations made to the students they helped. They further argue defendants' statute of limitations and choice of law theories should not be a basis for striking class allegations at the pleading stage. We conclude the trial court did not err. Plaintiffs' SAC allegations raise numerous statute of limitations questions that necessarily require individualized inquiries regarding many, if not all, plaintiffs. These individualized issues predominate over common questions of law and fact.[1]

### I.

### *Legal Standards*

To properly allege a class, plaintiffs must "demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021.) Community of interest, or commonality, embodies three factors, including " 'predominant common questions of law or fact.' " (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089; see Civ. Code, § 1781, subd. (b)(2); Code Civ. Proc.,

---

[1] Because we conclude the statute of limitations issues are so great as to defeat the certification of a class here, we do not address the parties' contentions regarding the reliance and choice of law issues.

8

§ 382.) Community of interest in law and facts ultimately rests on whether " 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, at p. 1021.) "Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334.)

During the pleading stage, "it is sufficient that there is a reasonable possibility plaintiffs can establish a prima facie community of interest among the class members on [a] false representation issue." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814.) Accordingly, to grant a motion to strike, the trial court must conclude " 'that the suit was without the realm of probability of being properly tried as class litigation.' " (*Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 59 (*Blakemore*).)

An order striking all class allegations from a complaint, such as the order at issue here, essentially dismisses the action as to all members of the putative class other than the named plaintiffs. Therefore, it is appealable at the pleading stage. (*Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634, 641.) Our review of such an order is de novo. (*Ibid*.) This is because "[a] motion to strike, like a demurrer, challenges the legal sufficiency of the complaint's allegations, which are assumed to be true." (*Blakemore*, *supra*, 129 Cal.App.4th at p. 53.) "[B]y contrast [with later motions to certify a class,] there is no 'substantial evidence' to review." (*Id*. at p. 54.) The "motion to strike . . . class allegations 'raises only the narrow issue whether this suit as a matter of law lacks sufficient community of interest to sustain a class action.' " (*Ibid*.)

## II.

### *Statute of Limitations*

Plaintiffs argue that the court erred in striking their class allegations because of statute of limitations issues, such as the need to individually determine when plaintiffs' claims accrued pursuant to the "discovery rule," i.e., when they discovered defendants had made misrepresentations. Plaintiffs assert that they "do not rely on the discovery

9

rule . . . , but rather their causes of action did not accrue until [they] suffered damage. In this case, damage would not be suffered until the student defaults on the loans and the lender collects from the cosigner. Further, the defense of the statute of limitations does not appear on the face of the [SAC]." The court's ruling amounts to "mere conjecture" at the pleading stage.

Plaintiffs' argument is unpersuasive in the face of their own pleadings. They filed suit in 2013. They defined their putative class as comprising of "not fewer than several thousand class members" who "cosigned student loans taken by students" or "borrowed in their own names to pay tuition and costs for students" who enrolled in and/or graduated from CCA at any time between January 1, 2003, and December 31, 2008. Therefore, unlike the *Amador* action, which was initiated in or before 2007,[2] in this case five to 10 years passed between the end of the students' time at CCA and plaintiffs' commencement of their lawsuit. This brings statute of limitations questions to the fore with respect to the four claims remaining after the trial court's rulings on defendants' demurrers. The gravamen of plaintiffs' claims rests on allegations that CCA made various affirmative misrepresentations.[3] Therefore, both plaintiffs' fraud and negligent misrepresentation claims are subject to the three-year statute of limitations stated in Code of Civil Procedure section 338, subdivision (d).[4] (*Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920 [applying the three-year statute of limitations to both such claims] (*Broberg*); see also *Ventura County Nat. Bank v. Macker* (1996) 49 Cal. App.4th 1528, 1530–1531 and *E-Fab Inc. v. Accountants, Inc. Services*

---

[2] A document from the *Amador* action that is contained in the record refers to it as ongoing in 2007.

[3] Plaintiffs contend that defendants also engaged in fraudulent concealment of certain facts, but these allegations mostly contend that plaintiffs did not disclose that their affirmative misrepresentations were false. The focus of plaintiffs' complaint is on CCA's affirmative misrepresentations.

[4] Code of Civil Procedure section 338, subdivision (d) states that in "[a]n action for relief on the ground of fraud or mistake," "[t]he cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

10

(2007) 153 Cal.App.4th 1308, 1316 (*E-Fab*) [both indicating the statute of limitations depends on the gravamen of a negligent misrepresentation claim].) The statute of limitations is four years from the date of accrual for UCL claims (Bus. & Prof. Code, § 7208).

Under the "discovery rule," however, such statutes of limitation do not necessarily accrue until a plaintiff's discovery of the alleged misrepresentations. (Code Civ. Proc., § 338, subd. (d); see *Broberg*, *supra*, 171 Cal.App.4th at p. 920 [indicating the discovery rule applies to fraud and negligent misrepresentation claims and, in the court's view, despite a split among the appellate courts, to unfair competition causes of action resting on claims of deception in marketing]; *Britton v. Girardi* (2015) 235 Cal.App.4th 721, 733–734 [a cause of action for fraud does not accrue until the date the complaining party learns, or at least is put on notice, that a representation was false]; *E-Fab*, *supra*, 153 Cal.App.4th 1308, 1314–1319 [applying the discovery rule to a negligent misrepresentation claim].)

These statute of limitations periods and/or the discovery rule would need to be litigated for most, if not all, of the putative class members, whether alleged by plaintiffs to be direct borrowers or cosigners.

## A. *Direct Borrowers*

As for direct borrowers, we must assume this group constitutes significant numbers of people in light of plaintiffs' contention that the overall size of the class is in the thousands. Plaintiffs do not contest—indeed, they do not address—that a direct borrower is damaged at the time he or she enters directly into the loan obligation. They give us no reason, and we have none, to disagree with defendants' assertion that this is the case, as indicated in cases defendants cite. (See, e.g., *Dang v. First Horizon Home Loan Corp.* (S.D. Cal., Aug. 22, 2013, No. 12-cv-0343) 2013 U.S. Dist. LEXIS 119669, at *11–*12 [granting motion to dismiss fraud claim as time-barred because "the harm allegedly done to Plaintiffs occurred as soon as the loan was made, and all of the claims . . . are attributable to the original lending documents"]; see also *Rodriguez v. Wells Fargo Bank, N.A.* (E.D. Cal., July 21, 2011, No. 2:11-CV-00553 JAM-EFB)

11

2011 U.S. Dist. LEXIS 79632, at *10–*11 [noting that the plaintiff's UCL claim "arises from acts that occurred in the loan application and underwriting process"].)

Thus, large numbers of potential class members, who by the complaint's allegations entered into their loans at some time between 2003 and 2008, would be unable to maintain their claims against defendants *unless* they could establish upon defendants' challenge that they did not discover, and could not reasonably have discovered, CCA's misrepresentations until within three or four years of the lawsuit's commencement in 2013.

Although defendants raised these discovery rule issues regarding the putative "direct borrower" class members front and center in their moving papers below and raise them again in this appeal, plaintiffs have yet to address them. We fail to see how these issues can be managed effectively within a class action. Plaintiffs rely largely on purported affirmative misrepresentations by CCA regarding numerous subjects, such as about CCA being a good investment, its placement statistics, admissions, process, reputation, career services and the ability of graduates to repay loans. These misrepresentations necessarily require an investigation into when each of the direct borrowers discovered which of CCA's purported representations were false, leading inevitably to much litigation centering on what individual class members knew when and whether they can maintain their claims.

## B. *Cosigners*

These individual inquiries are not limited to direct borrower plaintiffs, either. Plaintiffs assert that the claims of cosigner class members would not be subject to the discovery rule because these members were not damaged until "recently." Since damages are an essential element of their claims, these cosigner claims did not accrue until Sallie Mae initiated collections activity against the cosigners, which occurred only recently. Therefore, the argument goes, it is not relevant when cosigners discovered defendants had made misrepresentations. We do not find this argument persuasive for several reasons.

12

It is true that "damages" are an essential element of negligent misrepresentation and intentional misrepresentation claims (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255 [referring to "resulting damage" as one of five elements for both negligent and intentional misrepresentation claims]; *Aryeh v. Canon Business Solutions Inc.* (2013) 55 Cal.4th 1185, 1193), and that part of what plaintiffs sought in their UCL cause of action was "restitution and disgorgement" of all money paid to defendants "by means of their . . . unlawful, unfair and fraudulent business practices." Plaintiffs are also correct that a cosigners' action for damages may not necessarily accrue until after the lender seeks to enforce their obligations. (See *Engstrom v. Kallins* (1996) 49 Cal.App.4th 773, 783 [property owner's declaratory relief claim based on lender's failure to give her statutory cosigner notice in connection with loan to a former husband that was secured by owner's property did not accrue until lender attempted to enforce security interest through foreclosure because "[n]o harm to the cosigner would occur so long as the maker of the note continued to make payments"].) Further, plaintiffs allege that they and putative class members "only recently began experiencing damages as a result of the Defendants' conduct. CCA students often applied for and were granted deferments on their loans, allowing them to delay the start date of their student loan payments (and also incurring significant fees to do so and continuing to accrue interest at high rates.) Sallie Mae has now recently begun attempting to collect on these student loans from the cosigners, including Plaintiffs."

Nonetheless, it is apparent from the face of plaintiffs' complaint that numerous cosigners *would* face statute of limitations challenges. This is because, first, a cosigner for a CCA student who graduated or dropped out of school early in the class period would very likely have incurred damages at some point well before the suit was filed in 2013. Second, regarding when cosigners incurred damages, plaintiffs allege "that CCA students often applied for and were granted deferments on their loans, allowing them to delay the start date of their student loan payments." These allegations invite highly individualized inquiries to determine whether some or all of the cosigner claims are barred by the statute of limitations, i.e., which students received deferments, how long

13

such deferments lasted, when students defaulted on their loans, and when Sallie Mae began to pursue their cosigners. Also, as the trial court noted, there may well be further individualized inquiries to determine whether certain other class members' claims are even ripe; that is, whether Sallie Mae has initiated collection actions against them.

## C. *Other Case Law*

In our own research, we have found one state case, *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282 (*Mass Mutual*), rejecting the argument that possible statute of limitations issues defeated class certification. Defendant Mass Mutual petitioned for an extraordinary writ after the trial court certified plaintiffs' class of 33,000 people who, over a period of 15 years, had purchased a life insurance product from Mass Mutual. Plaintiffs alleged that Mass Mutual sold them these policies without disclosing it had no intention of maintaining a discretionary dividend rate that would eventually enable them to pay their annual premiums with their dividends, in violation of the UCL and CLRA. (*Id*. at p. 1286.)

The *Mass Mutual* court focused most of its attention on whether or not class members would be required to make certain individualized showings under UCL and CLRA law that would predominate over common questions, and concluded that they would not. (*Mass Mutual*, *supra*, 97 Cal.App.4th at pp. 1288–1295.) In a short discussion at the end of the opinion, the court dismissed Mass Mutual's additional contention that its statute of limitation defenses would require individual determinations of fact. The court reasoned that since plaintiffs alleged nondisclosure, the question was when a reasonable person would have discovered the basis for a claim. (*Id*. at p. 1295.) The court concluded: "Given the fact that plaintiffs' claim is based on a nondisclosure, the objective determination of when the nondisclosure should have been discovered seems readily amenable to class treatment." (*Ibid*.) The court further noted, quoting from a federal district court case, that " '[c]ourts have been nearly unanimous . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action so long as the necessary commonality and . . . predominance are otherwise

present.' " (*Id.* at p. 1296, quoting *In re Energy Systems Equip. Leasing Sec. Litigation* (E.D.N.Y. 1986) 642 F.Supp. 718, 752–753 (*In re Energy Systems*).)

*In re Energy Systems* involved a class certification of seven cases that were consolidated, involving three complaints and forty-one causes of action, based on allegations that defendants jointly developed, participated in, and aided and abetted a sophisticated nationwide tax shelter scheme which systematically defrauded investors of tens of millions of dollars. (*In re Energy Systems*, *supra*, 642 F.Supp. at pp. 723–724, 729–731.) Near the end of a lengthy opinion regarding numerous other issues, the district court rejected defendants' motion to dismiss and granted the plaintiffs' motion for class certification. In that context, the court concluded the fact that certain individual investors would have to show compliance with certain limitations periods for certain claims, with which plaintiffs alleged they were in compliance, did not bar class certification of those claims. (*Id.* at pp. 745, 752–753.) It is apparent from the discussion that these claims were only one part of a much larger class action dispute.

These cases do not alter our analysis here because of the significant difference between individualized statute of limitations issues that *may* arise or that arise amidst numerous claims and issues on the one hand, and individualized statute of limitations issues that necessarily *must* arise in order for many, if not all, potential class members to establish the accrual of any causes of actions. (See *Waste Mgmt. Holdings, Inc. v. Mowbray* (1st Cir. 2000) 208 F.3d 288, 296 [noting that "a necessity for individualized statue-of-limitations determinations invariably weighs against class certification"].) As our own Supreme Court has stated in concluding that a nuisance and inverse condemnation action was not suitable for a class action because it was predicated on facts peculiar to each prospective plaintiff, " ' "a group of individuals' rights to recover, each of which is based on a separate set of facts, cannot be determined by a judgment in a class action." ' " (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 460.)

Further, as explained in the leading treatise on class actions, individualized statute of limitations issues *have* defeated class certification efforts in cases involving torts that arise on discovery of latent injuries. (See 2 Rubenstein, Newberg on Class Actions (5th

15

ed. 2012) § 4.57, p. 217, fn. 4, citing *Barnes v. American Tobacco Co.* (3d Cir. 1998) 161 F.3d 127, 149 ["determining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification" because each member's smoking history would have to be examined to determine if his or her claims have timely accrued]; *Broussard v. Meineke Disc. Muffler Shops, Inc.* (4th Cir. 1998) 155 F.3d 331, 342, 352 [reversing the lower court's class certification order, in part because "tolling the statute of limitations on each of plaintiffs' claims depends on individualized showings" of knowledge of certain misrepresentations and obfuscations].)  These cases are analogous here, where many, if not all, class members would be required to establish unique facts about the discovery of or accrual of their claims in order to proceed.

In short, it is clear from the face of plaintiffs' complaint that the parties of a class action here would first engage in many, many months, if not years, of individualized inquires into the right of class members to pursue their particular claims.  This is particularly the case when one considers that defendants would make these issues a priority early in the case in order to limit the size of the class as much as possible, which the trial court may well find to be appropriate under the circumstances.  (See *Quezada v. Loan Ctr. of Cal., Inc.* (E.D.Cal., Dec. 17, 2009, No. 2:08-00177) 2009 U.S. Dist. LEXIS 122537 at \*27–\*29 [denying a class certification motion, including because "whether the statute of limitations may be equitably tolled for each class member will be a highly individualized inquiry that will be necessary before the court may even reach the merits of each plaintiff's claim"], citing *Block v. Major League Baseball* (1988) 65 Cal.App.4th 538, 544–546.)[5]

Therefore, we agree with the trial court's assessment that statute of limitations issues would require numerous individualized inquiries to resolve.  These issues fatally undermine the community of interest among the plaintiffs.

---

[5]  Code of Civil Procedure, section 597 generally allows a trial court at its discretion to proceed with a trial of a special defense before the trial of any other issue in the case.

16

## DISPOSITION

Our Supreme Court has stated: "Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system. [Citations.] ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . ." ' [Citation.] Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 434–435.) Plaintiffs' claims are not so insubstantial that they cannot be pursued individually. More importantly, the many individualized inquiries that would by necessity be required in this action, as indicated by plaintiffs' SAC allegations, would frustrate many from obtaining prompt relief, and be of no benefit to the courts.[6] The trial court's order striking all class allegations is affirmed. Respondents are awarded costs of appeal.

---

[6] Of course, we base this conclusion on plaintiffs' allegations in the SAC and the documents of which the trial court took judicial notice only. Our conclusions herein do not, and are not intended to, indicate that plaintiffs could not conceivably make allegations in a later-amended complaint that would reduce or eliminate the need for the individualized inquiries that we have discussed here.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

MILLER, J.

*Enea v. California Culinary Academy* (A141886)