Filed 5/19/26  Russell v. Specialized Loan Servicing CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL L. RUSSELL et al., | B344406 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. 22AVCV00620 |
| SPECIALIZED LOAN SERVICING LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel L. Alexander, Judge.  Affirmed.

Lorden & Reed and Zshonette L. Reed for Plaintiffs and Appellants.

Houser, Robert W. Norman, Jr. and Neil J. Cooper for Defendant and Respondent.

Michael and Renita Russell (the Russells) filed a complaint against the servicer of their home loan, Specialized Loan Servicing LLP (SLS). According to the Russells, SLS overstated the amount due under the loan, failed to apply their payments, and collected monies not due. The Russells alleged this caused them to file for bankruptcy and sell their home at a short sale. SLS admitted it erroneously overstated the balance of the loan and collected more money from the proceeds of the sale than the Russells owed. After discovering the error, SLS returned the overpayment to the Russells with interest. SLS then moved for summary judgment on the ground that the Russells could not show damages. The trial court granted the motion and denied the Russells' motion for a new trial.

On appeal, the Russells argue SLS failed to meet its initial burden, there are triable issues of material fact, and the trial court made various errors while evaluating SLS's motion. The Russells also argue the court should have granted their motion for a new trial based on newly discovered material evidence. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. ***The loan and modifications***

In October 2006, the Russells obtained a $673,000 loan secured by their home in Palmdale (the Property). The Russells fell behind on their payments, and they entered into a loan modification agreement with the lender in 2013 (the 2013 Modification). The total amount due under the 2013 Modification was $720,231.21, consisting of $443,648.51 of interest-bearing principal and $276,582.70 of non-interest-bearing deferred principal.

2

SLS started servicing the loan in 2014.  At the time, the Russells were behind on their payments under the 2013 Modification.

In 2015, the Russells and SLS entered into another loan modification agreement (the 2015 Modification).  The 2015 Modification states the "modified unpaid principal balance" of the loan is $711,115.31 and the "amount deferred through this modification agreement is $123,434.69."  The agreement notes the amount deferred in "previous modification(s)" was $276,582.70.

SLS's records did not reflect the actual terms of the 2015 Modification.  Instead, the records showed a deferred principal balance of $310,017.39, which was $186,582.70 higher than it should have been.  SLS asserted the inflated deferred principal balance—which we refer to as "the overstatement"—resulted from human error while inputting the terms of the 2015 Modification into its records.  The overstatement did not affect the Russells' monthly payment obligations, which SLS calculated correctly using the non-deferred principal balance.

In February 2016, SLS began sending the Russells monthly statements erroneously stating the deferred balance on the loan was $310,017.39.  The statements reflected the Russells' correct monthly payment obligations.

The Russells failed to make monthly payments in February and June of 2016.  SLS sent the Russells a breach letter in October 2016, giving them a month to cure the default.  The Russells failed to do so.  Two years later, in October 2018, the substitute trustee under the deed of trust recorded a notice of default and election to sell.  The notice states the Russells were nearly $70,000 in arrears.

The Russells considered selling the Property in January 2019, and they asked SLS for a payoff demand. SLS sent the Russells a demand erroneously stating $944,859.10 was due under the 2015 Modification. The actual amount due was closer to $750,000.

## 2. *The bankruptcy*

In February 2019, the trustee recorded a notice stating the Property would be sold at a public auction on March 28, 2019. Ten days before the sale, Renita Russell[1] filed a petition for bankruptcy. In her petition, Renita listed the Property as an asset worth $625,000.

SLS filed a claim in bankruptcy court for $947,983.04. The claim stated the Russells had not made any payments on the 2015 Modification for two years. SLS asserted the amount necessary to cure the default as of March 2019 was $86,291.24.

The Russells made the monthly payments due under the 2015 Modification during the bankruptcy. They also made payments to the bankruptcy trustee, most of which went towards paying off the arrearages.

At some point during the bankruptcy, the Russells decided to separate from each other and sell the Property. In May 2021, the Russells unsuccessfully listed the Property for sale with an asking price of $950,000.

A few months later, the bankruptcy trustee filed a motion to dismiss the case "due to delinquent plan payments which has caused a material default with respect to the terms of the confirmed plan." According to the trustee's motion, Renita was

---

[1] We refer to the Russells by their first names for the sake of clarity.

4

delinquent in the amount of $6,093.88. The bankruptcy court granted the motion on November 9, 2021 and closed the case on January 7, 2022.

3. ***The attorney letters***

The Russells retained an attorney who sent SLS three letters between November 2021 and March 2022. The letters stated the Russells did not understand why the balance on their loan was so high. The letters asked SLS to provide documentation on various issues, including "how the indebtedness reached $905,646.88." In a March 2022 letter, the Russells' attorney noted it appeared SLS had erroneously included in the 2015 Modification the deferred balance from the 2013 Modification.

SLS responded to the letters and provided the Russells with documents related to the loan. SLS insisted the loan balance was correct, and it purported to show how it calculated the balance. SLS stated the 2015 Modification included a deferred balance of $400,017.39, consisting of $276,582.70 of unpaid deferred principal from the 2013 Modification plus $123,434.69 of new deferred unpaid principal. The letters also identified "arrears capitalized" consisting of $94,635.85 for expense advances paid, $90,018.00 for expense advances not yet paid, and $93,291.35 for administrative fees. The numbers SLS provided in the letters did not add up to the amounts it claimed were due.

4. ***The short sale***

In December 2021, the trustee recorded a notice of trustee's sale scheduled for January 27, 2022. In response, the Russells sent SLS a request for mortgage assistance. SLS responded by offering the Russells the option of a short sale. The offer required

SLS to receive at least $737,621.63 from the sale. The trustee postponed the sale until June 2022.

The Russells and SLS entered into a short sale contract in April 2022. The Russells sold the Property a month later for $792,000. SLS received $746,576.74 from the proceeds of the sale, which it accepted in satisfaction of the 2015 Modification.

**5.** ***The complaint***

The Russells filed a complaint against SLS in August 2022. The operative first amended complaint (FAC) asserted nine causes of action: (1) breach of contract; (2) negligence; (3) negligent misrepresentation; (4) intentional misrepresentation; (5) unfair business practices; (6) violation of the Rosenthal Fair Debt Collection Practices Act (RFDCPA, Civ. Code, § 1788 et seq.); (7) violation of the Real Estate Settlement Procedures Act (RESPA, 12 U.S.C. §2605(e); 12 C.F.R. § 1024.5); (8) receiving stolen property (Pen. Code, § 496); and (9) accounting.

According to the FAC, the actual balance owed under the 2015 Modification was $600,000 at the time of the sale in May 2022. It alleged SLS stole from the Russells $193,000, which was the difference between the sales price ($793,000) and the loan balance ($600,000). The FAC also alleged SLS inflated and misrepresented the unpaid principal balance, charged fees and costs in excess of $200,000, failed to offer loss mitigation options to prevent bankruptcy and foreclosure, recorded false documents, failed to apply payments, demanded and collected monies not due, and withheld surplus funds from the short sale.

The FAC alleged SLS's conduct caused the Russells to file for bankruptcy, lose equity by selling the Property at a short sale, suffer damage to their credit, be deprived of the Property, and incur incidental expenses and attorney fees. The Russells also

6

alleged SLS forced them to "endure great emotional distress, mental anguish, humiliation, shock, feelings of helplessness and desperation."

### 6. *SLS discovers an error in its records*

Sometime after receiving the complaint, SLS recalculated the balance due as of the date the Russells sold the Property. SLS used in its calculations a deferred balance of $123,434.69, which was the amount listed in the 2015 Modification. Using the correct deferred balance, SLS determined the Russells owed $732,515.37 as of the date they sold the Property.

In November 2023, SLS sent the Russells a letter with the corrected calculations. SLS included with the letter a check for $16,214.87. That amount represented the difference between the actual balance of the 2015 Modification at the time of sale ($732,515.37) and the amount SLS received from the sale ($746,576.74), plus 10 percent interest.

### 7. *SLS's motion for summary judgment*

SLS filed a motion for summary judgment in May 2024. Among many other grounds for relief, SLS argued the Russells could not show it caused them to suffer damages. SLS asserted its evidence showed it properly applied every payment it received on the 2015 Modification. SLS acknowledged it overstated by $186,582.70 the deferred balance due under the 2015 Modification, which caused it to receive more money from the sale than the Russells owed. However, SLS said the Russells suffered no damages because it returned the overpayment plus 10 percent interest.

SLS argued its evidence showed the overstatement did not cause the foreclosure, bankruptcy, or short sale. According to SLS, the foreclosure was the result of the Russells' failure to

make all monthly payments due under the loan, Renita filed for bankruptcy because the Property was underwater, and the Russells sold the home because they decided to end their marriage.

      a.    *Ollier's declaration*

In support of its motion, SLS submitted a declaration from its Second Assistant Vice President, Laura Ollier. According to Ollier, the Russells were already in default when SLS started servicing the loan in 2014. At the time, the 2013 Modification was the operative agreement. The Russells applied for mortgage assistance to cure the default. SLS used a computer program to determine whether the Russells were eligible for a modification. The computer program required SLS to divide up into various categories the deferred balance under the 2013 Modification, which was $276,582.70. SLS categorized $90,000 as " 'expense advances not yet paid,' " and it divided evenly the remaining $186,582.70 into two categories, " 'expense advances paid' " and " 'administrative fees.' "

Ollier asserted SLS ultimately offered the Russells the 2015 Modification with a total balance due of $711,115.31. The loan included a deferred principal balance of $123,434.69. It required the Russells to make a balloon payment of any unpaid amounts on December 1, 2036.

Ollier stated SLS made an error while entering the terms of the 2015 Modification into its records. SLS should have removed the entire deferred balance from the 2013 Modification ($276,582.70). However, "[d]ue to human error," SLS removed only $90,000 of the deferred balance. Because of that error, SLS's records showed a deferred balance of $310,017.39, rather than

8

$123,434,69. In other words, SLS's records overstated the deferred balance by $186,582.70.

According to Ollier, the overstatement did not affect the Russells' monthly payment obligations, which SLS had calculated correctly. SLS properly applied all the payments it received under the 2015 Modification. The last monthly payment the Russells made on the loan was in May 2021, a year before they sold the Property.

Ollier stated SLS did not discover the overstatement until 2023, and it never knowingly demanded more money than it believed was due. After discovering the overstatement, SLS paid the Russells the difference between the amount it received from the sale and the amount actually due at the time, with 10 percent interest.

b.    *Krausz declaration*

SLS submitted an expert declaration from a forensic accountant, Gary Krausz. Krausz said he reviewed "SLS's Payment History, SLS's monthly statements, [the Russells'] bank records . . . , and payment records from the trustee in Renita Russell's bankruptcy."

Krausz asserted SLS properly calculated the Russells' monthly payment obligations under the 2015 Modification. The Russells were in default in 2016 and never were out of default until they paid off the loan in May 2022. The overstatement had no impact on the monthly payments, the missed monthly payments, or the amount required to reinstate the loan.

Krausz calculated the amount due on the loan as of May 2022—when the Russells sold the Property—assuming a deferred balance of $123,434.69. He determined SLS received $14,061.37

9

more from the sale than was owed on the loan, which is the amount SLS returned to the Russells plus 10 percent interest.

c.     *Other evidence*

SLS attached to the motion excerpts from Renita's deposition.  In those excepts, Renita testified the Property was "underwater" when she filed for bankruptcy in March 2019, even assuming the balance was $276,000 less than SLS claimed at the time.  Renita said she filed for bankruptcy because she believed it was her only option.  As of the date of her deposition, Renita continued to believe bankruptcy was her only option, even knowing everything that had transpired since then.

Renita said the Russells decided to sell the Property and end the bankruptcy when they determined they "were going to go our separate ways."  But for the separation, Renita would have continued the bankruptcy.

SLS submitted a copy of Renita's March 2019 bankruptcy petition, which Renita signed under penalty of perjury.  The petition lists the Property as an asset valued at $625,000.

8.     ***The Russells' opposition***

In their opposition to SLS's motion, the Russells argued SLS failed to meet its initial burden.  According to the Russells, SLS's motion relied on the premise that the Property was underwater, notwithstanding the overstatement.  They asserted SLS failed to show the Property was underwater because it submitted no admissible evidence showing the value of the Property at the relevant times.  According to the Russells, the sales price did not represent the Property's true value "given the urgency of the short sale."

The Russells argued, even if SLS met its burden, there were triable issues of material fact on whether the Property was

underwater at the time of the sale. According to the Russells, but for SLS's overstatement, they would have sold the Property for a profit rather than pursuing bankruptcy and a short sale. The Russells also argued there were triable issues of material fact concerning whether SLS properly applied their payments.

a. *Renita's declaration*

Renita submitted a declaration in support of the Russells' opposition. Renita asserted the Russells discussed selling the Property in early 2019 and requested a payoff demand from SLS. SLS provided payoff demands in January and February 2019 showing the Russells owed more than $944,000. Renita was surprised the balance was so high. She contacted a friend "in the real estate industry" to ask about putting the Property up for sale. The friend said the Property would sell for about $800,000. After learning "we could not sell the Property because it was upside down," the Russells decided Renita would file for bankruptcy protection to force SLS to accept monthly mortgage payments and allow the Russells to make payments on the arrearages.

Renita said her records showed the Russells paid SLS more than $110,000 between March 2019 and May 2021. However, in May 2021, SLS told Renita the total balance had decreased only by $40,000. Renita suspected SLS had not applied all the payments. At that point, she decided to dismiss the bankruptcy case and try to sell the Property.

Renita asserted the Russells listed the property for sale in May 2021 with an asking price of $950,000. The Russells did not

11

receive any offers.[2] In June 2021, the Russells asked SLS to accept a deed in lieu of foreclosure. SLS declined the offer, stating title was not clear because of an issue with a home equity line of credit.

Renita said she requested another payoff demand in December 2021. SLS responded that the Russells owed more than $900,000. That same month, Renita received notice of a trustee's sale listing a payoff amount of more than $905,000. Renita received three more payment demands in March 2022, each showing the Russells owed more than $915,000.

According to Renita, the Russells learned SLS had approved them for a short sale in April 2022. The Russells' attorney advised them to go forward with the sale to avoid foreclosure.

Renita asserted the short sale caused the Russells to lose title, possession, and enjoyment of the Property. It also caused them to sell their personal property and furnishings "in an estate fire sale" and incur "moving, relocation and storage fees, and housing and related expenses." The Russells suffered "extreme emotional distress as a result of the problems with SLS," which led to the breakdown of their marriage.

  b.  *Asuncion's declaration*

The Russells submitted a declaration from Lawrence Asuncion, who described himself as a "forensic securitization audit and mortgage foreclosure fraud analyst" and a "subject matter expert on the secondary mortgage market." Asuncion said he holds a "degree in Economics" and has more than 36 years "of

---

[2]  At her deposition, Renita testified the Russells received a single offer "in the [$]500,000['s]."

actual work experience and professional practice in the financial industry."

Asuncion stated he reviewed the Russells' financial documents and determined SLS failed to apply $4,497.69 worth of payments to the loan between March 2019 and June 2021. Asuncion noted SLS's explanation for the overstatement was not plausible. He said SLS's June 2022 letter—which it sent in response to the Russells' request for clarification of the amount owed—was ambiguous and erroneous. According to Asuncion, SLS's statements in the letter suggest it made significant accounting errors.

c. *Other evidence*

The Russells submitted an IRS Form 1098 Mortgage Interest Statement for the 2015 Modification stating the "outstanding mortgage principal" was $544,253.17 as of January 1, 2022. According to the Russells, the form reflects information SLS disclosed to the IRS.

The Russells also submitted a "Broker's Price Opinion" (BPO), which estimated the "drive-by 'as-is value' " of the Property to be $870,000 as of January 2022. According to the Russells, SLS produced the BPO in response to their discovery requests.

SLS filed 36 objections to the Russells' evidence. We discuss some of the objections in other sections of the opinion.

**9.	*The court's orders and judgment***

The trial court granted SLS's motion. The court concluded SLS was entitled to summary judgment on the breach of contract and negligence claims because the Russells could not show they suffered damages. The court noted the Russells did not dispute they defaulted on the loan, the loan was underwater without

13

regard to the deferred balance, the Russells were not eligible for further modification, and SLS did not owe them further modification.  The court determined the undisputed evidence showed the overstatement had no impact on the Russells' monthly payment obligations or the amount required to reinstate the loan, the Russells' decision to sell the Property was independent of SLS, and SLS ultimately returned to the Russells the overpayment, plus interest.

The court found the Russells' misrepresentation claims were time barred to the extent they were premised on statements SLS made in 2015 and 2016.  The court stated the only actionable misrepresentations took place after November 2021.  However, those misrepresentations could not have caused the Russells' damages because they took place after Renita decided to terminate the bankruptcy and sell the Property.  The court also noted the undisputed facts showed SLS was not aware of the overstatement until 2023, after the sale.  Therefore, any alleged misrepresentations were not intentional.

With respect to the remaining claims, the court found the Russells did not demonstrate they lost money or property as a result of the overstatement.  The court stated, "[I]n short, SLS's November 2015 overstatement appears to have played no part in [the Russells'] alleged injuries. . . .  [¶]  Without the essential element of some damage, something having been taken from them, or SLS having something that arguably belongs to the [Russells], each of their remaining causes of action is subject to summary judgment based on the undisputed material facts."

14

The court entered judgment for SLS on December 13, 2024. The Russells filed a motion for a new trial on December 19, 2024, which the court denied.[3]  The Russells timely appealed.

**DISCUSSION**

**1.**     ***The trial court properly granted SLS's motion for summary judgment***

The Russells argue the trial court erred in granting SLS's motion for summary judgment.  They contend SLS failed to meet its initial burden, there are triable issues of material fact, and the court made various errors while evaluating the motion.

    a.     *Standard of review*

Summary judgment is appropriate if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show the plaintiff cannot establish one or more elements of the cause of action or cannot refute an affirmative defense.  (*Id.*, § 437c, subds. (o), (p)(2).)  If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact on the cause of action or defense.  (*Id.*, § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 (*Aguilar*).) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 845.)  "The pleadings determine the issues to be addressed by a

---

[3]     We discuss the Russells' motion for a new trial in more detail later in the opinion.

summary judgment motion." (*Arce v. The Ensign Group, Inc.* (2023) 96 Cal.App.5th 622, 628 (*Arce*).)

"On appeal from a summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist.  [Citations.]  We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment." (*Arce*, *supra*, 96 Cal.App.5th at pp. 628–629; see also *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 ["Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion"]; *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 342 [moving party's affidavits are strictly construed while those of the opposing party are liberally construed].)

When reviewing an order granting a motion for summary judgment, we perform the same three-step analysis as the trial court.  We "(1) identify the issues framed by the pleadings, (2) determine whether the moving party has established facts justifying judgment in its favor, and (3) determine whether the nonmoving party has demonstrated a triable issue of material fact." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1206–1207.)  In conducting our review, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)  We accept as undisputed facts only those parts of the moving party's evidence that are not contradicted by the evidence of the opposing party.  (*Arteaga*, *supra*, 163 Cal.App.4th at p. 342.)  " 'We need not defer to the trial court and are not bound by the reasons in its summary

16

judgment ruling; we review the ruling of the trial court, not its rationale.' " (*Arce, supra,* 96 Cal.App.5th at p. 629.)

b. *The issues framed by the FAC*

At the first step of the analysis, we identify the issues framed by the FAC. The Russells asserted nine causes of action in the FAC, each of which had unique elements. However, with the exception of the accounting claim, each cause of action required the Russells to show SLS engaged in some sort of misconduct that caused them to suffer actual damages. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [breach of contract requires the plaintiff to show damages resulting from the breach]; *Merrill v. Navegar, Inc., supra,* 26 Cal.4th at p. 477 [negligence requires the plaintiff suffered damages proximately caused by the defendant's breach]; *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230–231 [negligent and intentional misrepresentation require "resulting damage"]; 12 U.S.C. § 2605(f) [violators of RESPA are liable for "actual damages to the borrower as a result of the" violation]; Civ. Code, § 1788.30, subd. (a) [a debt collector who violates the RFDCPA is liable for "actual damages sustained by the debtor as a result of the violation"]; Pen. Code, § 496, subd. (c) [a "person who has been injured by a violation of [Pen. Code, § 496] may bring an action for three times the amount of actual damages"].) To prevail on their accounting claim, the Russells had to show " 'some balance is due . . . that can only be ascertained by an accounting.' " (*Sass v. Cohen* (2020) 10 Cal.5th 861, 869 (*Sass*).)

To satisfy these elements, the FAC alleged SLS engaged in misconduct by overstating the balance of the 2015 Modification, collecting monies not due, and failing to apply all the Russells'

17

payments.[4]  The FAC alleged SLS's misconduct caused the Russells to receive less money from the sale of the Property than they were entitled to receive.  It also alleged the misconduct forced the Russells to file for bankruptcy and sell the Property at a short sale to avoid a trustee's sale, which in turn caused them to lose title and use of the Property, suffer damage to their credit, experience emotional distress, lose equity, and incur incidental expenses.

        c.     *SLS met its initial burden*

At the second step of the analysis, we ask whether SLS presented evidence sufficient to justify judgment in its favor.  As we discussed above, the Russells' claims were premised on allegations that SLS failed to apply their payments, collected monies not due, and overstated the balance of the 2015 Modification.  We separately address SLS's evidence as it relates to each allegation.  We then address the Russells' arguments on appeal.

---

[4]     The FAC also alleged SLS improperly failed to offer mortgage assistance and recorded false documents.  The Russells do not address those allegations on appeal, so we do not consider them.  (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"]; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate courts need "not develop the appellants' arguments for them"].)

###### i. Failure to apply payments

SLS presented evidence refuting the Russells' claims based on the allegation that it failed to apply their payments. SLS's accounting expert asserted he reviewed "SLS's Payment History, SLS's monthly statements, [the Russells'] bank records . . . , and payment records from the trustee in Renita Russell's bankruptcy." The expert "traced every payment [SLS] received and how it was applied to the [2015 Modification]," and he concluded "all payments were applied correctly." This was sufficient to show SLS did not fail to apply the Russells' payments. Accordingly, SLS met its initial burden to refute claims based on that allegation.

###### ii. Collection of monies not due

SLS presented evidence refuting the Russells' claims based on the allegation that it collected monies not due. SLS admitted it received more money from the sale of the Property than the Russells owed under the 2015 Modification. However, SLS presented evidence showing it returned the overpayment to the Russells with interest. SLS's accounting expert asserted he reviewed the payment records and concluded SLS received $14,061.37 more from the sale than the Russells owed under the 2015 Modification. SLS presented evidence that, in November 2023, it returned the overpayment to the Russells with 10 percent interest from the sale date. This was sufficient to show the Russells suffered no damages as a result of the overpayment, refuting their claims premised on that allegation.

###### iii. The overstatement

SLS presented evidence refuting the Russells' claims premised on the overstatement. SLS admitted it overstated the balance due under the loan. However, as we discuss, it presented

19

evidence refuting the Russells' allegations that the overstatement caused them to file for bankruptcy and sell the Property. Because all of the Russells' alleged damages flowed from the bankruptcy and sale, SLS met its burden to refute the claims premised on the overstatement.

SLS presented evidence refuting the Russells' allegation that the overstatement caused Renita to file for bankruptcy. The FAC alleged the Russells had "no choice but to file a Chapter 13 bankruptcy petition to arrange to pay down the arrearages to save their home." SLS's undisputed evidence showed the Russells were at risk of losing the home because they failed to make monthly payments in February and June of 2016, which caused them to default on the loan. According to SLS's accounting expert, the overstatement "had no impact" on the Russells' scheduled monthly payments or the amount required to reinstate the loan after the default. Therefore, the overstatement had "no conceivable impact on [the Russells'] failure to make monthly payments or reinstate the [2015 Modification]."

Renita seemed to confirm the overstatement did not cause her to file for bankruptcy. Renita testified at her deposition that she continued to believe bankruptcy was her only option, even knowing everything that had transpired since she filed the petition. In other words, Renita admitted she would have filed for bankruptcy even if she knew the actual amount due under the 2015 Modification. Considered with the expert declaration, this evidence was sufficient to show the overstatement did not cause the Russells to suffer damages related to the bankruptcy, including damage to their credit and emotional distress. (See *Yanez v. Plummer* (2013) 221 Cal.App.4th 180, 187 ["conduct is

20

not a substantial factor in causing harm if the same harm would have occurred without that conduct"].)

SLS also presented evidence refuting the Russells' allegation that the overstatement caused them to sell the Property. At her deposition, Renita testified the Russells ended the bankruptcy and listed the Property for sale because they decided to separate. The Russells seem to concede that issue on appeal, admitting their "decision to sell was voluntary, caused by the separation." Accordingly, SLS met its burden to show the overstatement did not cause the Russells to suffer damages flowing from the sale, including loss of title to the Property, loss of beneficial use and enjoyment of the Property, emotional distress, the loss of personal property, and incidental expenses.

Finally, SLS presented evidence refuting the Russells' allegation that they lost equity because they were forced to "dispose of the Property at a short sale to prevent the loss by a trustee sale." SLS's undisputed evidence showed the Russells' default and failure to reinstate the loan—not SLS's overstatement—caused the pending trustee's sale. Therefore, even assuming the Russells sold the Property for a lower price in order to avoid the trustee's sale, any loss of equity was caused by their default, not by SLS's overstatement.

To summarize, SLS presented evidence that it properly applied the Russells' payments and returned the overpayment it received from the sale. SLS admitted overstating the loan's balance, but it presented evidence showing the overstatement did not cause the Russells to file for bankruptcy, sell the Property, or suffer damages flowing from those decisions. SLS also presented evidence showing any loss of equity resulted from the Russells' default and failure to reinstate the loan, which were not

21

connected to the overstatement. This evidence refuted the Russells' allegations that SLS caused them to suffer damages, which were essential to their claims for breach of contract, negligence, negligent and intentional misrepresentations, violations of RESPA and the RFDCPA, unfair business practices, and receipt of stolen property. The evidence also refuted an essential element of the Russells' accounting claim, which required them to show " 'some balance is due . . . that can only be ascertained by an accounting.' " (*Sass*, *supra*, 10 Cal.5th at p. 869.) Accordingly, SLS met its initial burden on summary judgment.

iv.    The Russells' arguments

The Russells contend SLS failed to meet its burden because it produced no admissible evidence showing the fair market value of the Property. The Russells assert such evidence was necessary because SLS's "entire" motion "rested on a single factual premise: that [the Property] lacked equity at the time of the sale, such that the admitted accounting error caused no damages." We disagree.

Contrary to the Russells' assertion, SLS did not argue they lacked equity at the time of the sale. In fact, SLS conceded the Russells had equity, which it erroneously withheld from them. However, SLS argued the Russells suffered no damages because, after recognizing its error, it returned the equity plus interest.

SLS did argue the Property was "underwater" when Renita filed for bankruptcy, meaning it was worth less than the actual amount due under the 2015 Modification at the time. However, SLS presented admissible evidence to support that assertion. SLS submitted Renita's deposition testimony that the Property was underwater when she filed for bankruptcy, even assuming the total balance of the loan was only $668,000. Renita's

22

testimony was consistent with her March 2019 bankruptcy petition, in which she represented under penalty of perjury that the Property was worth $625,000. According to Ollier, as of February 1, 2019, the Russells owed more than $630,000 on the 2015 Modification, not including any deferred principal. Thus, assuming a deferred principal balance of $123,434.69, Renita's own valuation showed the Property was underwater by more than $100,000. This was sufficient evidence to support SLS's contention that the Property was underwater when Renita filed for bankruptcy.[5]

We also reject the Russells' passing contention that SLS failed to address their entitlement to statutory damages under RESPA and the RFDCPA. The Russells did not raise the issue in their opposition to SLS's motion for summary judgment. Nor did they raise it at the hearing on the motion. Their failure to do so forfeits the issue on appeal. (See *California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1593, fn. 7 ["When an argument is not asserted below in opposition to a motion for summary judgment, it is deemed waived and will not be considered for the first time on appeal to

---

[5] Contrary to the Russells' arguments, Renita's bankruptcy petition and testimony were not inadmissible lay opinion and hearsay if used to show the Property's value. The Evidence Code states the "value of property may be shown" by the opinions of the "owner or the spouse of the owner of the property . . . being valued." (Evid. Code, § 813, subd. (a)(2).) Moreover, Renita's statements were party admissions, and therefore not inadmissible under the hearsay rule. (*Id.*, § 1220.) Thus, Renita's statements—both in her bankruptcy petition and at her deposition—were admissible to show the value of the Property.

reverse an order granting summary judgment"]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 [it "is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal"].)

Even if we were to overlook the forfeiture, we would reject the Russells' arguments on the merits. Under RESPA, a court may award up to $2,000 in statutory damages "in the case of a pattern or practice of noncompliance with the" statute. (12 U.S.C. § 2605(f)(1)(b).) The FAC did not request statutory damages under RESPA, nor did it explicitly allege SLS engaged in a "pattern or practice of noncompliance." Therefore, SLS did not have the burden to address the issue in its motion for summary judgment. (See *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1254 (*Conroy*) [a defendant moving for summary judgment need only refute theories of liability alleged in the complaint].)

The FAC did seek statutory damages under the RFDCPA, which allows courts to impose penalties between $100 and $1,000 on debt collectors who "willfully and knowingly" violate the statute. (Civ. Code, § 1788.30, subd. (b).) The FAC alleged the Russells are entitled to recover a statutory penalty because SLS's violations of the RFDCPA were willful and knowing. However, SLS presented evidence refuting that allegation. Ollier asserted in her declaration, "SLS was not aware of and did not discover the error in the deferred principal balance until 2023 and, up until that time, believed the $310,017.39 deferred balance stated in its system was correct." According to Ollier, once SLS discovered the error, it returned to the Russells the overpayment plus interest. This was sufficient to show any violations of the RFDCPA were not knowing or willful. Therefore, SLS met its

24

initial burden to show the Russells were not entitled to statutory damages under the RFDCPA.

    d.    *The Russells did not raise triable issues of material fact*

Because SLS met its initial burden to show the Russells could not establish at least one element of each of their causes of action, the burden shifted to the Russells to present evidence demonstrating triable issues of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850–851.)

The Russells argue they met their burden by presenting evidence showing they suffered damages under the "prevention doctrine." Specifically, they contend they raised triable issues of fact concerning whether SLS's overstatement prevented them from exercising their right to cure the default by selling the Property through a conventional sale. According to the Russells, their evidence showed they had substantial equity in the Property dating back to 2019, which made a conventional sale a viable option to cure the default. They contend SLS's overstatement was a "substantial factor in eliminating a conventional sale option and steer[ed] the transaction into a short sale structure" . . . "under which all proceeds were directed to the lender/servicer and [they] received no equity."

We agree with SLS that the Russells did not explicitly plead this theory of liability in the FAC. The FAC alleged the Russells lost equity because SLS "forced [them] to dispose of the Property at a short sale to prevent the loss by a trustee sale." It did not specifically allege SLS's overstatement prevented the Russells from exercising their right to cure the default by selling the Property in a conventional sale. Nor did it allege the Property would have sold at a higher price at a conventional sale,

25

even with the impending trustee's sale.  SLS did not have the burden to negate theories not alleged in the FAC.  (See *Conroy, supra*, 45 Cal.4th at p. 1254.)  Nor could the Russells assert new theories in opposition to SLS's motion for summary judgment without first moving to amend the complaint.[6]  (See *Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.)

Even assuming the Russells properly pleaded the prevention theory, they failed to show triable issues of fact with respect to it.  The Russells' theory required them to show they had more equity in the Property than they received from the sale.  According to the Russells, they met their burden by submitting evidence showing the Property was worth between $820,000 and $870,000, and they owed $640,825 as of May 2022.  Therefore, the Russells contend, their evidence shows SLS caused them to lose between $87,485 and $229,175 worth of equity.

The Russells fail to cite any admissible evidence to support their claim that the Property was worth $820,000 to $870,000.  The Russells point to Renita's statement in her declaration that she "contacted a friend in the real estate industry to inquire

_____

[6]     According to the Russells, the FAC's allegations of "an inflated balance exceeding market value, failed efforts to sell, and a resulting forced short sale" state "a prevention claim as a matter of law."  They do not support that assertion with meaningful analysis or citations to relevant authority.  Therefore, we do not consider it.  (See *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 ["the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited"].)

about putting our home up for sale [in 2019]" and "was told that the house would only sell for about $800,000 at that time."[7] They also point to the BPO estimating the "drive-by 'as-is value' " of the Property to be $870,000 as of January 2022.

SLS objected to Renita's friend's statement and the BPO on hearsay grounds, but the trial court did not rule on the objections. Under these circumstances, "the objections are presumed overruled and are preserved for appeal." (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 890.) We review the objections "de novo, consistent with the general standard of review applicable to summary judgment rulings, that any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.) Applying that standard, we sustain SLS's objections. Renita's friend's statement and the BPO are hearsay if used to prove the value of the Property, and the Russells do not identify any relevant exceptions to the hearsay rule. Accordingly, the evidence was not admissible and we may disregard it. (See Evid. Code, § 1200, subd. (b) [hearsay is inadmissible except as provided by law].)

The Russells also failed to present admissible evidence to support their assertion that they owed $640,825 on the loan as of May 2022. As best we can tell, the Russells arrive at that number by subtracting from the amount SLS claimed was due ($917,407.89) the deferred balance under the 2013 Modification

_____

[7] It is not clear, and the Russells do not explain, how Renita's friend's assertion that the Property would sell for "about $800,000" shows it was worth $820,000 to $870,000.

($276,582.70). The Russells, however, do not cite any evidence showing SLS overstated the balance by $276,582.70.[8] In contrast, SLS presented evidence showing the actual deferred balance was $123,434.69, which was $186,582.70 less than the amount it claimed was owed ($310,017.39). Using a deferred balance of $123,434.69, SLS's accounting expert determined the Russells owed $732,515.37 as of May 2022. The Russells presented no evidence to the contrary.

The Russells argue they raised triable issues by producing a form 1098 Mortgage Interest Statement containing information SLS purportedly submitted to the IRS. The IRS form states the principal outstanding on the 2015 Modification was $544,253.17 as of January 1, 2022. The Russells contend this shows SLS either knew its inflated payoff demands were false, or its accounting systems were completely unreliable. We disagree. The IRS form reflects the "outstanding mortgage principal" balance of the loan—not the total debt owed—and it is entirely consistent with SLS's payoff demands to the Russells. Indeed, in mid-December 2021, SLS sent the Russells a payoff statement showing they owed a principal balance of $544,253.17, exactly the same amount as the principal outstanding listed on the IRS form.[9]

---

[8] The Russells cite a paragraph of Renita's declaration in which she discusses four mortgage statements she received from SLS in 2022 showing the overstated balance. They also cite copies of the mortgage statements. The Russells do not meaningfully explain how Renita's declaration or the mortgage statements are evidence the loan's balance was $640,825.

[9] The Russells question how SLS could demand more than $900,000 to pay off the loan when the outstanding principal

28

We reject the Russells' argument that they raised triable issues by presenting evidence showing SLS's overstatement was a "superseding cause breaking the causal chain." The Russells contend, although they defaulted in 2016, the 2019 inflated payoff demand "constituted an independent intervening act that materially altered the legal and factual circumstances." Superseding cause is a "defense . . . which absolves a tortfeasor, even though his conduct *was* a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.) The defense has no application here.

In passing, the Russells argue they raised triable issues concerning whether SLS properly applied their payments. The Russells point to a declaration from their purported expert, Lawrence Asuncion. Asuncion asserted he reviewed the Russells' and SLS's records and concluded SLS failed to give the Russells credit for $4,497.69 in payments they made to the bankruptcy trustee.

SLS objected to Asuncion's declaration as improper expert testimony under Evidence Code section 720, but the trial court did not rule on the objection. Considering the objection de novo, we sustain it. (See *Reid*, *supra*, 50 Cal.4th at p. 535.) Even

---

balance was only $544,253.17. The answer is that SLS's payoff demands included a deferred principal balance of $310,017.39, outstanding interest of $26,571.15, an escrow advance balance of $20,001.91, and various other fees on top of the non-deferred principal balance of $544,253.17.

viewing the record in the light most favorable to the Russells, they failed to present sufficient evidence to establish Asuncion had the "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Asuncion did not purport to have any education, training, or experience in accounting. Asuncion asserted he holds "a degree in Economics," but he did not identify the type of degree, when he received it, or what institution issued it. Asuncion also claimed to have more than 36 years of "actual work experience and professional practice in the financial industry." However, he did not identify any specific experience in accounting. Nor did Asuncion otherwise explain how he gained the knowledge and skill required to evaluate accounting issues. Without such evidence, Asuncion was not qualified to give expert opinions on accounting-related issues. Accordingly, his declaration did not provide admissible evidence that SLS failed to apply all the Russells' payments.

The Russells make a number of other arguments, including that the trial court erroneously found their claims are barred by the statute of limitations, made "internally contradictory factual determinations" regarding the parties' knowledge, resolved factual issues related to SLS's responses to qualified written requests, weighed evidence, failed to address material evidence, and failed independently to analyze each cause of action. Even assuming the trial court erred in those respects, the errors do not warrant reversal. As we discussed, SLS met its initial burden to show the Russells could not establish at least one element of each claim alleged in the FAC. The burden shifted to the Russells to establish contested issues of fact, which they failed to do.

30

Whether the trial court erred in the manner the Russells contend does not change that fact.  Therefore, the purported errors do not warrant reversing the judgment.  (See *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 [a judgment may not be reversed for a procedural error unless it results in a miscarriage of justice].)

**2.**    ***The trial court did not abuse its discretion when it denied the motion for a new trial***

The Russells argue the trial court should have granted their motion for a new trial based on newly discovered material evidence.

a.    *Background*

The Russells filed a motion for a new trial after the court granted SLS's motion for summary judgment.  Among other grounds for relief, the Russells argued a new trial was warranted based on newly discovered material evidence.  The Russells noted Renita stated in her declaration attached to their opposition that a friend in the real estate industry advised her the Property was worth about $800,000.  Renita believed she had received an email in 2019 confirming the valuation, but she could not locate it.  During a conversation with her daughter sometime after the court granted SLS's motion for summary judgment, Renita realized "she had an interaction with another realtor in 2021 who sent the email with valuation documents."  Renita "searched her 2021 emails and discovered contemporaneous documentation from licensed realtor Karen Goddard confirming that SLS's inflated balance independently prevented a market-value sale."  The Russells asserted the email could not, with reasonable diligence, have been discovered and produced earlier.

The Russells attached a printout of the Goddard email to the motion.  Karen Goddard sent the email to Renita on May 6,

2021.  In the email, Goddard wrote, "I have pulled comparable homes and tried to get the value up as high as possible.  $820,000 is the highest home that has closed in your neighborhood and it had a pool.  Wasn't as upgraded, so your upgrades would possibly be a wash for the pool."  According to Goddard, "$850,000 would be the highest you could list and get an appraisal in—buyers might drive the price up, but it would not be enough to get you out without a short sale."  Goddard said, "Listing at $950,000 to break even, is not really an option as there are no comparable homes to support that price."  Goddard noted she could not "figure out how you went from your loan at $673,000 in 2006 to owing over $907,000 now."  Goddard suggested Renita ask SLS to audit the file and provide a detailed list of how the loan "ballooned up so large."

The Russells argued the Goddard email "materially strengthen[ed]" their case "by providing professional confirmation that SLS's inflated balance independently prevented market sale and forced the short sale outcome."  They asserted the email also showed the Property would not have been underwater absent SLS's inflated figures.

SLS opposed the Russells' motion.  It argued the Goddard email did not provide grounds for a new trial because Renita admitted the email was available to her earlier.  SLS also argued the email was immaterial and inadmissible hearsay if used to establish the Property's value.

The trial court denied the motion for a new trial.  With respect to the Goddard email, the court explained "[f]ailure to recall a name or a year associated with a record does not excuse failure to produce it earlier. . . .  Ms. Russell also does not detail what efforts she made to search her email for this

communication.  It is unclear why the email would not have been revealed through easily ascertainable search terms that could have been applied to her whole email archive, or at least to a slightly broader period than a single year.  The Court declines to reverse its judgment based solely on a party's failure to responsibly search its email."

b.    *Analysis*

A party may file a motion for a new trial seeking to overturn an order granting a motion for summary judgment. (*Doe v. United Air Lines, Inc.* (2008) 160 Cal.App.4th 1500, 1504 (*United Air Lines*).)  "Where a party seeks a new trial on the grounds of newly discovered evidence, '[t]he essential elements which must be established are (1) that the evidence is newly discovered; (2) that reasonable diligence has been exercised in its discovery and production; and (3) that the evidence is material to the movant's case.'  [Citation.]  'The newly discovered evidence must be material in the sense that it is likely to produce a different result.' "  (*Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 778–779; see Code Civ. Proc., § 657, subd. 4.)

We review a trial court's denial of a motion for a new trial based on newly discovered evidence for an abuse of discretion. (*United Air Lines*, *supra*, 160 Cal.App.4th at p. 1504.)  We will not overturn the decision unless the record clearly shows a manifest and unmistakable abuse of discretion.  (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159.)

Evening assuming the Goddard email constituted "newly discovered evidence," the trial court did not abuse its discretion by finding the Russells failed to exercise reasonable diligence in discovering and producing it.  The Russells do not dispute they

33

had access to the Goddard email when they filed their opposition to the motion for summary judgment.  Nor do they dispute the trial court's observation that they could have discovered the email by applying "easily ascertainable search terms" to Renita's "whole email archive, or at least to a slightly broader period than a single year."  Renita asserted she failed to discover the email because she limited her initial search to emails received in 2019, the year she believed the conversation with the realtor took place.  However, the Russells did not explain why she failed to broaden her search when the limited search yielded no results.  Given the relative ease with which the Russells could have discovered the Goddard email, the trial court did not abuse its discretion when it concluded they failed to show reasonable diligence.  Accordingly, the Russells have not shown the court erred when it denied their motion for a new trial.  (See *Fomco, Inc. v. Joe Maggio, Inc.* (1961) 55 Cal.2d 162, 166 [party failed to show diligence where newly discovered evidence was accessible through "inquiry or examination" of public records].)

The Russells contend the trial court failed properly to evaluate whether Renita's search efforts "satisfied the diligence standard under the particular circumstances of searching years of electronic communications."  They contend the court instead simply considered whether "perfect diligence theoretically could have uncovered the evidence sooner."  The record refutes their contentions.  The court's detailed written order reflects a thorough understanding of the law as well as the Russells' arguments and evidence.  There is nothing even to suggest the court applied the wrong standard or otherwise failed properly to evaluate the Russells' arguments.

34

## DISPOSITION

We affirm the judgment.  Specialized Loan Servicing LLC shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.